**L.G.B. INC., Plaintiff,**

v.

**The GITANO GROUP, INC., G.V. Gitano, Inc. and G.V. Licensing, Inc., Defendants.**

**No. 89 Civ. 5249 (WK).**

United States District Court, S.D. New York.

May 17, 1991.

---

Milton S. Gould, Shea & Gould, New York City, for defendants.

Thomas J. Hall, Chadbourne & Parke, New York City, for plaintiff.

## OPINION & ORDER

WHITMAN KNAPP, District Judge.

This litigation arises from a dispute between a licensor and its licensee over the right to use the "Gloria Vanderbilt" trademark (the "Mark") on women's swimwear, sweaters, and activewear. The parties first appeared before us on September 12, 1989 shortly after the complaint was filed. However, later in the same month the parties advised us that they had entered into serious settlement negotiations and, at their request, all litigation activity was suspended for about fourteen months.

The matter is now before us on three separate motions: (1) defendant-licensor G.V. Licensing, Inc.'s ("Licensing") motion for a preliminary injunction prohibiting plaintiff from further use of the Mark during the course of the litigation; (2) plaintiff's motion for partial summary judgment on its claim that its licenses are exclusive; and (3) the motion of defendants Licensing, G.V. Gitano, Inc. ("G.V. Gitano"), and The Gitano Group, Inc. ("Group") to dismiss various claims asserted in the amended complaint.

This opinion will deal only with Licensing's motion for a preliminary injunction. For reasons that follow, that motion is denied because the inordinate delay in seeking such relief makes impossible a finding of irreparable harm.

## BACKGROUND

I. *Events Giving Rise to the Litigation.*

Plaintiff obtained its licenses from the Mark's former owners, Murjani International Limited and its successor, Murjani Worldwide, B.V. (collectively, "Murjani"), pursuant to three agreements, each covering a different category of women's apparel. The first such agreement, dated May 18, 1984, covers swimwear and, on November 15, 1984, was expanded to include beachwear (the "Swimwear License"); the second, dated September 29, 1988, covers sweaters and coordinated sweater bottoms (the "Sweater License"); and the third, also dated September 29, 1988, covers performancewear and activewear, which include tennis, bicycle and warm-up suits (the "Activewear License"). The three twenty-plus page agreements drafted by Murjani are almost identical.

Among the numerous obligations imposed upon the plaintiff by these agreements are: that it obtain Murjani's written approval of garments bearing the Mark prior to their sale or distribution; that it maintain the distinctiveness of the Mark; that it—at the risk of termination—meet certain annual minimum sales levels, which levels ranged from $1 to $8 million, depending on the license and on the particular annual period; and that it spend a certain

percentage of its revenue on advertising. ¶¶ 8.2, 8.3, 7.1 Each agreement also required that plaintiff pay annually a guaranteed minimum royalty to be credited against a quarterly percentage royalty, and that it deliver to Murjani quarterly royalty reports substantiating its calculations of the percentage royalty due and confirming that it has met its minimum sales requirements.

According to plaintiff, Murjani never strictly enforced these requirements, and licensor and licensee enjoyed an amiable and successful collaboration from the inception of their relationship in May of 1984, until on or about December 23, 1988, when Murjani sold the Mark to defendant G.V. Gitano and assigned to it all of its rights under various licensing agreements, including those entered into with plaintiff. G.V. Gitano later changed its name to G.V. Licensing, Inc. For ease of reference, we will refer to it as "Licensing."

When Licensing took over as plaintiff's licensor, an increasingly discordant relationship ensued. On February 3, 1989, Licensing notified plaintiff that it had begun "formulating [its] overall licensing and marketing strategies." Exh. A, Sneider Feb. 25 Affid. These "strategies" apparently included a decision to assert that the licenses plaintiff had obtained from Murjani were non-exclusive. Concurrently, Licensing began requiring strict compliance with the terms of the various agreements, and set forth with particularity the procedures by which plaintiff was to effect such compliance. See Exh. 23 to Albert Reply Affid. Plaintiff—to an extent not possible to determine on this record—failed so to comply. It opposed Licensing's stated position that the licenses were non-exclusive, and claimed, among other things, that Licensing had improperly rejected garments it had submitted for approval.

A letter dated July 27, 1989 sent by Licensing to Luis Sneider, plaintiff's chief executive officer, illustrates the tenor of the escalating conflict between the two entities:

> After reviewing the bathing suits and the "Swimwear" line list received on July 13 as a result of our meeting at your offices, we are unable to process your "Swimwear" submission.
>
> As previously noted, we can not make an approval decision without a complete representation of a season's line. During our visit to your office and warehouse, we saw numerous garments containing the "Beachwear" Gloria Vanderbilt label. However, no such items were submitted for approval. As we have told you in the past, until we receive samples (and completed approval forms) that represent the entire Fall '89 Swimwear line (which includes coordinated cover-ups), you may not sell or offer for sale any such items—they must be submitted first for approval.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Also, I received a copy of your letter dated July 10, 1989.... In it you made reference to your "Exclusive Licenses".
>
> As you are aware, we consider those licenses to be non-exclusive. I do not want to be put in a position of having to restate our position every time you assert the licenses to be without limitation for the future that it is our firm position that your three licenses are non-exclusive.

Exh. B, Sneider Feb. 25 Affid.

Thus, Licensing and plaintiff grew to perceive each other as, respectively, tyrannical licensor and renegade licensee. While Licensing asserted that plaintiff was ignoring certain of its obligations under the licensing agreements, plaintiff contended that Licensing's insistence on strict compliance with the licensing agreements—which Murjani, as above noted, had not required—was part of a bad faith attempt to squeeze plaintiff into relinquishing the exclusivity of its licenses.

## II. *The Onset of Litigation.*

Plaintiff filed the instant action on August 3, 1989. The complaint named as defendants both G.V. Licensing, Inc. and G.V. Gitano, Inc. (to which we here collectively refer as "Licensing") and The Gitano Group, Inc. ("Group"), their corporate parent. It sought, *inter alia*, declaratory and injunctive relief recognizing and enforcing

the exclusivity of its licenses; declaratory. and injunctive relief establishing that Murjani by its leniency during the time it had been licensor had waived strict compliance with the licenses' terms and that such waiver is binding upon Licensing, or, in the alternative, that Licensing—having allegedly informed plaintiff at a meeting held on April 24, 1989 that it would not seek strict compliance before January 1990—should be precluded from requiring strict compliance before that time. The complaint also sought damages under theories of breach of the duty of good faith and fair dealing, breach of contract, fraud and negligent misrepresentation.

One week later, by three separate letters dated August 9, 1989, Licensing notified plaintiff that it was terminating all three licenses. The letters asserted numerous grounds for termination, including: failure to submit proposed lines for approval; manufacturing, showing and selling garments which had not been approved or were beyond the scope of the license; failure to maintain the "distinctiveness of the mark," for example, by using the same garment in both the "beachwear" and "activewear" categories and by manufacturing identical garments under both the Gloria Vanderbilt label and plaintiff's own "Pacific Beach" label; failure to submit advertising for approval; failure to "maintain a separate area for the sale of the Licensed Items"; failure to maintain adequately trained sales personnel; failure to monitor the use of the Mark by its (plaintiff's) customers; failure to make quarterly reports of its advertising and promotional activities; failure to submit an advertising budget prior to each annual period; failure to submit advertisements for approval; failure to maintain complete and accurate books and records; failure properly to label garments; failure to disclose required information about third-party manufacturers; and failure to use best efforts to advertise and sell. Each asserted ground for termination was accompanied by a citation to the paragraph of the licensing agreement allegedly breached. Exh. 13 to Albert Feb. 28, 1991 Affid.

On August 10, the firm of Shea & Gould filed a notice of appearance on defendants' behalf. Four days later plaintiff moved to disqualify that firm on the ground that, approximately one month prior to commencement of the litigation, Sneider had discussed the parties' dispute with a trademark and licensing attorney in its corporate department. Although that attorney had no involvement in defendants' representation in this litigation, plaintiff asserted that the disclosure of confidential information to him required that the entire firm be disqualified, because of the possibility that defendants' lawyers might have received information that could give them unfair advantage at the trial.

On August 17, defendants filed their answer to the complaint, in which defendant Licensing asserted counterclaims for, *inter alia*, trademark infringement, unfair competition and breach of contract, based on the misconduct set forth in the above-described termination notices.

On September 11, plaintiff, by order to show cause, requested a hearing on a motion for a preliminary injunction essentially enjoining Licensing from doing anything implementing its position that the licenses had been terminated by the above-described notices, and extending the period within which plaintiff could cure the alleged defaults. Plaintiff also sought a temporary restraining order granting such relief during the pendency of the motion.

The following day we met with the parties to discuss the issues raised .by the litigation and the then pending motions. The parties were in agreement that one of the primary issues raised by the litigation is whether or not plaintiff's licenses were exclusive. Having previously reviewed the three licensing agreements, we made known our tentative conclusion that the licenses were unambiguously exclusive. As to the preliminary relief plaintiff had requested, the parties agreed between themselves to work out a stipulation in lieu of a restraining order. Finally, counsel for Licensing indicated that it intended to cross-move for a preliminary injunction prohibiting plaintiff from further using the

Mark. This motion was apparently going to be based on the same general catalog of misconduct set forth in the August 9 termination notices, with particular emphasis on plaintiff's continued sale of items for which it had not obtained approval.

### III. *The Settlement Hiatus.*

On September 21, the parties notified us that they had reached an agreement in principle, and made the first of several requests for adjournment of all motions to enable them to negotiate and reduce to writing the details of their agreement. On November 3, we were again advised that the parties were continuing their efforts to resolve the matter and that, in light of the complexity of the negotiations, it might be premature to reschedule the motions. Accordingly, we adjourned the motions without date. Thereafter we occasionally inquired about the status of the matter and each time were assured that settlement negotiations were actively being pursued.

### IV. *Resumption of the Litigation.*

In the fall of 1990 it became apparent that the matter would not be settled. On or about October 23, Licensing sent to plaintiff a notice of default alleging that plaintiff had failed, among other things, to pay certain advertising amounts and certain royalties. Exh. 5, Sneider March 12, 1991 Affid.

On November 7, 1990, the parties appeared for a conference and notified us that, despite extensive negotiations involving many exchanges of drafts of new licensing agreements, the matter could be resolved only through litigation. The parties then agreed that plaintiff would furnish a bond upon the posting of which Licensing would consent to a tolling of cure periods with respect to the defaults alleged in its October 23 notice. On November 30, we heard oral argument on the motion to disqualify, and on December 18 issued our decision denying it.

On January 2, 1991 plaintiff—with defendants' consent—filed an amended complaint, that, among other things supplements the factual allegations underlying the original claims with events that had occurred since the commencement of the action. For example, in connection with the fraud and negligent misrepresentation claims, it alleges that Licensing made certain misrepresentations during the course of the settlement negotiations with the intention of encouraging plaintiff to commit further defaults. It also contains several new claims, including trademark infringement based on allegations that defendants, either directly or through other licensees, had used the Mark in violation of plaintiff's exclusive licenses; and intentional interference with contractual relations and with prospective economic advantage based on allegations that Licensing, in the course of competing with plaintiff, had discouraged customers from doing business with it.

On February 1, defendants filed their motion for partial dismissal of the amended complaint, seeking to dismiss: (1) all claims as against Group and G.V. Gitano, Inc.; and (2) as against G.V. Licensing, Inc.: the first and second claims for relief (the claims predicated on plaintiff's assertion that its licenses are exclusive); the third, fourth and fifth claims for relief (based on allegations of trademark infringement); the fourteenth and fifteenth claims for relief (based on the theories, respectively, of common law fraud and negligent misrepresentation); and the sixteenth claim (based on intentional interference with contractual relations and prospective economic advantage).

On February 4, defendants filed their answer to the amended complaint that, among other things, supplemented the allegations underlying Licensing's counterclaims for breach of contract and trademark infringement to include additional allegations of plaintiff's misconduct prior to and after commencement of the litigation.

### V. *The Instant Motion.*

On March 1, defendant Licensing filed its motion for a preliminary injunction, seeking to enjoin plaintiff from further use of the Mark. The motion seems to have been prompted by plaintiff's failure in January to make payment of guaranteed minimum royalties and of percentage royalties based on actual sales, as well as its failure to report its sales for the fourth quarter of

1990. See Albert Feb. 28 Affid. ¶ 3; Transcript of March 21 Hearing (hereinafter, "Tr. at ___") at 34–35. In further support of the motion, Licensing noted "that these latest defaults are merely a continuation of [plaintiff's] prior actions in disregard of its obligations," Albert Feb. 28 Affid. ¶ 18, and set forth the history of plaintiff's alleged violations under the licensing agreements since Licensing had succeeded Murjani as licensor. Thus, it contends, plaintiff has "continually violated Licensing's rights to monitor the use of its Trademark under the License Agreements" by flouting the licensing agreements' approval requirements. Albert Feb. 28 Affid. ¶ 19; see also Mem. at 4 ("From the outset of its relationship with Licensing, [plaintiff] has flouted its obligations and displayed an outright disregard for Licensing's rights as licensor and owner of the Trademark.")

As examples of plaintiff's chronic disregard of these requirements, the motion lists 101 styles of garments for which plaintiff never sought approval, but in its quarterly royalty statements nevertheless reported to Licensing that it had sold. Exh. 8, Albert Feb. 28 Affid. A breakdown of that list reveals that more than two-thirds of those styles were reported sold in 1989, i.e. before, or within five months after, the commencement of this litigation. The motion also sets forth instances when plaintiff has submitted styles for approval, but has done so either after the garments were shipped for resale or so soon before that time that Licensing was deprived of any meaningful opportunity to monitor and control the quality of the garments. Albert Feb. 28 Affid. ¶¶ 21–24. An overwhelming majority of those instances occurred in 1989. Exhs. 9–12, Albert Feb. 28 Affid. Moreover, the motion asserts, plaintiff has reported sales of items which Licensing expressly disapproved. Albert Feb. 28 Affid. ¶ 25. Sixty five of the 97 instances of such reported sales occurred in 1989. Exh. 12, Albert Feb. 28 Affid.

On March 5, plaintiff filed its cross-motion for summary judgment on the question of whether or not its licenses are exclusive. On March 21, we heard oral argument on all motions, and thereafter granted the parties' successive requests for leave to submit additional materials, the last of which were received in chambers on April 22.[1]

## DISCUSSION

The conduct prompting the demand for a preliminary injunction falls into three categories: plaintiff's recent non-payment of royalties; its failure timely to report sales for the fourth quarter of 1990; and its failure otherwise to comply with the licensing agreements, including its sale of unapproved garments.

■ With respect to the non-payment of royalties, it seems clear that, although the motion is timely, the failure to pay money—certainly by one who is solvent defendant—does not constitute irreparable harm. See, e.g., Tucker Anthony Realty Corp. v. Schlesinger (2d Cir.1989) 888 F.2d 969, 975; Loveridge v. Pendleton Woolen Mills, Inc. (2d Cir.1986) 788 F.2d 914, 917–18; Jackson Dairy, Inc. v. H.P. Hood & Sons (2d Cir. 1979) 596 F.2d 70, 72.

■ With respect to the second category (as to which defendant's motion also is timely), we cannot say—all other things being equal—that plaintiff's failure promptly to make appropriate reports would denigrate the Mark or otherwise cause irreparable injury.[2]

■ As to the third category, such misconduct—if proved—would certainly constitute a basis for concluding that plaintiff had misused the Mark and violated Licensing's rights therein. However, as has already been observed, the vast preponderance of this misconduct is claimed to have occurred in 1989, and the balance—as Licensing itself asserts—merely constitutes a continuation of the same. Accordingly, by

---

1. Without our leave both parties have submitted material said to be relevant to plaintiff's motion for partial summary judgment, the most recent of which arrived in our chambers today.

2. We note that, since the instant motion was filed, plaintiff made available to Licensing the royalty statements at issue. See Exh. 52 to Sneider Sur–Reply Affid.

no stretch of the imagination can it be said that this category supports Licensing's claim that it is in urgent need of speedy action to protect its rights. To the contrary, its failure promptly to move for enforcement of those rights indicates a reduced need for such immediate, drastic relief. As the Court of Appeals has noted, "[s]ignificant delay in applying for injunctive relief ... tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction." *Citibank, N.A. v. Citytrust* (2d Cir.1985) 756 F.2d 273, 276 (preliminary injunction vacated where movant filed motion more than ten weeks after learning that the allegedly infringing activity had commenced and more than nine months after receiving notice that the alleged infringer intended so to act); *see, e.g., Gear, Inc. v. L.A. Gear California, Inc.* (S.D.N.Y.1986) 637 F.Supp. 1323, 1332 (three and one-half month delay in seeking relief after one-year delay in filing suit).

Here, given the recitation of grievances in its termination notices of August 9, 1989 and the allegations in its answer to the complaint filed one week later, Licensing must concede that it is now seeking emergency relief on the basis of a course of conduct claimed to have begun over a year and a half ago. Assuming *arguendo* that the period attributable to settlement negotiations should be excluded from the calculation of delay—which would seem doubtful where, as here, that period exceeded a year—Licensing's delay from the time of the November 7, 1990 conference, at which the parties announced to us that the possibility of settlement had been exhausted, until its March 1, 1991 motion for a preliminary injunction, vitiates any presumption that it will suffer irreparable harm in the absence of preliminary relief. Licensing had by then twice issued notices of termination to plaintiff, had maintained for well over a year that plaintiff was denigrating its Mark by, *inter alia,* failing to comply with approval procedures, and had indicated more than a year earlier that it intended to move for a preliminary injunction

to enjoin such conduct. It nevertheless saw fit to delay an additional sixteen weeks before bringing the instant motion on March 1. Having countenanced plaintiff's alleged misconduct for that period of time, it stretches credulity for Licensing now to assert that the prospect that plaintiff will continue so to act while the litigation proceeds warrants the emergency measure of a preliminary injunction.

In its submissions, Licensing fails to address the effect of its delay. Instead, citing *Church of Scientology Intn'l v. Elmira Mission* (2d Cir.1986) 794 F.2d 38, it contends that it is entitled to a finding of irreparable harm as a matter of law. In that case, the defendants ran a religious mission that had obtained a franchise from the Church of Scientology to propagate the Church's teachings in the region of Elmira, New York. The defendants, after a dispute with the Church, renounced the franchise but continued to purport to propagate its faith. The Church—without delaying or doing anything else that might indicate that it had acquiesced in defendants' unauthorized conduct—sought a preliminary injunction. The Court of Appeals noted that the "unauthorized use of a mark by a former licensee invariably threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark." *Id.* at 43. In so stating, it had no occasion to consider whether such injury must be presumed where, as here, the licensor had notice of the uses complained of for over a year and a half before it requested preliminary injunctive relief.

In sum, Licensing's application for a preliminary injunction must fail because its delay vitiates any claim of irreparable harm, "the single most important prerequisite for the issuance of a preliminary injunction," *Bell & Howell: Mamiya Co. v. Masel Supply* (2d Cir.1983) 719 F.2d 42, 45. Indeed, on the facts before us, it would appear that the status quo—which a preliminary injunction is intended to preserve, *see Guiness & Sons v. Sterling Pub. Co.* (2d Cir.1984) 732 F.2d 1095, 1099—would best be maintained by the denial of such relief.

## CONCLUSION

For the reasons stated, defendant G.V. Licensing, Inc.'s motion for a preliminary injunction is denied. We decide no other question.

SO ORDERED.