**L.G.B. INC., Plaintiff,**

v.

**The GITANO GROUP, INC., G.V. Gitano, Inc. and G.V. Licensing, Inc., Defendants.**

**No. 89 Civ. 5249 (WK).**

United States District Court, S.D. New York.

July 1, 1991.

Thomas J. Hall, Chadbourne & Parke, New York City, for plaintiff.

Milton S. Gould, Adam B. Gilbert, Shea & Gould, New York City, for defendants.

## OPINION & ORDER

### WHITMAN KNAPP, District Judge.

By Opinion & Order dated May 17, 769 F.Supp. 1236, we denied defendant G.V. Licensing, Inc.'s ("Licensing") preliminary injunction application, and reserved decision both on plaintiff's motion for summary judgment on its claim for a declaratory judgment establishing the exclusivity of its licenses, and on defendants' motion pursuant to Fed.R.Civ.P. 12(b)(6) which (1) sought dismissal of the entire amended complaint as against The Gitano Group ("Group"), which is Licensing's parent, and G.V. Gitano, Inc. ("G.V. Gitano"); and (2) sought dismissal as against all defendants of the first and second claims (those predicated on plaintiff's assertion that its licens-

es are exclusive); the third, fourth and fifth claims (based on allegations of trademark infringement and unfair competition); the fourteenth and fifteenth claims (based on theories, respectively, of common law fraud and negligent misrepresentation); and the sixteenth claim (based on intentional interference with contractual relations and prospective economic advantage).

For reasons that follow, we now grant plaintiff's motion for partial summary judgment, and grant in part and deny in part defendants' motion to dismiss the amended complaint.

The background of the litigation is set forth in our May 17 opinion, familiarity with which is assumed.

## I. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff moves for summary judgment on its claim for a declaratory judgment establishing the exclusivity of its three licenses. Because we conclude that the agreements unambiguously evidence that the parties at the time of contracting intended the licenses to be exclusive, which intent is consistent with evidence of their subsequent conduct, the motion is granted.

### A. *Background*

As noted in our May 17 opinion, plaintiff obtained its licenses from Murjani International Limited and its successor, Murjani Worldwide, B.V. (collectively, "Murjani"), pursuant to three agreements, each covering a different category of women's apparel. The first such agreement, dated May 18, 1984 covers swimwear and was, on November 15, 1984, expanded to include beachwear (the "Swimwear License"); the second, dated September 29, 1988, covers sweaters and coordinated sweater bottoms (the "Sweater License"); and the third, also dated September 29, covers performancewear and activewear, which include tennis, bicycle and warm-up suits (the "Activewear License").[1] On or about December 23, 1988, Murjani sold the Mark to

---

1. The licenses are annexed to the Amended Complaint as Exhibits A (Swimwear License), C (Sweater License), and D (Activewear License).

defendant Licensing, along with its rights under all three licensing agreements.

The question of whether or not the licenses are exclusive arose soon after Licensing succeeded Murjani as licensor. According to the amended complaint:

> Since February 1989, various conversations and meetings have taken place between representatives from [plaintiff] and various Gitano entities. At those meetings, representatives of the defendants ... advised [plaintiff's] representatives for the first time that, in their view, the license agreements were non-exclusive and that Gitano had the right, either directly itself or indirectly through other licensees, to use [the Mark] on ladies' swimwear, cover-ups, beachwear, sweaters, coordinated sweater bottoms, performance wear and activewear.

Am. Cmplt. ¶ 26

As our May 17 opinion noted, this question was discussed at a conference before us on September 12, 1989, shortly after this litigation was commenced and just prior to the start of the protracted but unsuccessful attempt at settlement. We then expressed our tentative conclusion that the three licenses seemed unambiguously exclusive.

In its motion to dismiss the amended complaint, Licensing contends, *inter alia*, that the licenses are unambiguously *non-exclusive*. Soon after the motion to dismiss was filed, plaintiff moved for summary judgment, contending that the licenses are unambiguously *exclusive*, and offered extrinsic evidence in an effort to demonstrate that Murjani had so intended them to be.

The extrinsic evidence offered by plaintiff included affidavits from several former Murjani employees who had participated in the negotiation, execution and/or monitoring of plaintiff's three licenses. These affiants include: Charles Cornwell, who, as vice president of Murjani's Licensing and International Operations, had negotiated the terms of the Swimwear License, and had executed it on Murjani's behalf; Hugh Docker, who, as Murjani's Design Manager, had been in charge of monitoring plaintiff's performance under the Swimwear License and who later was promoted to Vice President of Licensing Operations; Irene Narissi, who, as Murjani's Licensing Manager, participated in the negotiations for the Sweater and Activewear Licenses; and Helen Isaacson, who, as an account executive at Murjani, also was involved in the negotiations for those licenses. Each of their affidavits in various ways asserts that it is the present recollection of the affiant that it was Murjani's intention to make the particular license discussed by the affiant to confer an *exclusive* license. Cornwell Affid. ¶ 5; Docker Affid. ¶ 3; Narissi Affid. ¶ 4; Issacson February 21 Affid. ¶ 4. We conclude that such present recollection of past intent would be inadmissible at a trial and therefore should not be considered on this motion.[2] *Cf. Lubrication & Maintenance, Inc. v. Union Resources Co.* (S.D.N.Y.1981) (Weinfeld, J.) 522 F.Supp. 1078, 1081 ("Determination of the intent of the parties at the time they entered into the contract is not governed by their unexpressed subjective views.")

However, the affidavit of each of the above-mentioned Murjani employees also asserts that Murjani's conduct with respect to the license under discussion was wholly consistent with such asserted intention. Thus, with respect to the Swimwear License, Cornwell and Docker both observed that during their employment Murjani never competed with plaintiff during the time it acted as licensor. Cornwell stated in his affidavit:

> In fact, during the period Murjani acted as licensor under the swimwear license while I was employed by Murjani, Murjani never manufactured or sold or licensed to a third party to manufacture or sell any such Licensed Items bearing [the Mark].

Cornwell Affid. ¶ 5; see Docker Affid. ¶ 3

As for Murjani's conduct during the approximately three months that it acted as

---

**2.** We likewise decline to consider the present recollections of past intent of: (1) Luis Sneider, plaintiff's president, whose affidavits have been offered by plaintiff; and (2) Mohan Murjani, who served as Murjani's director during its tenure as plaintiff's licensor and whose affidavit has been offered by Licensing.

licensor under the Sweater and Activewear Licenses, both Isaacson and Narissi stated that during that time, Murjani had never manufactured or sold, or licensed to another the right to manufacture or sell, items covered by the licenses. Narissi Affid. ¶ 4; Isaacson Feb. 21 Affid. ¶ 4. These assertions as to conduct stand uncontradicted in the record.

### B. *Discussion*

■ Each of the agreements provides that it is governed by New York law. Swimwear License ¶ 20.3; Sweater License ¶ 21.3; Activewear License ¶ 21.3 Under New York law, we first look to the written agreements to ascertain the parties' intent, limiting our inquiry to the words of the agreements so long as the agreements set forth the parties' intent clearly and unambiguously. *See Nicholas Laboratories Ltd. v. Almay, Inc.* (2d Cir.1990) 900 F.2d 19, 20–21 (applying New York law). In discerning the parties' intent from the written agreements, we of course are guided by the fundamental principle that a reasonable and effective meaning be given to every one of the agreements' provisions. *See, e.g., Rothenberg v. Lincoln Farm Camp, Inc.* (2d Cir.1985) 755 F.2d 1017, 1019 ("an interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect"). Bearing these principles in mind, we conclude that the agreements unambiguously evidence the parties' intent that the licenses be exclusive. We cannot conclude otherwise in light of the nearly identical language that appears in paragraph 4.8 of each agreement.

Paragraph 4.8 of the Swimwear License provides:

4.8 *Freedom to License.* In the event of termination of this Agreement or the receipt by Murjani of a notice of termination from Licensee, Murjani shall be free to license to others the use of the Mark in connection with the manufacture and sale of Items in the Territory, but only if all advertising and sale of such Items produced pursuant to such third

party agreements is prohibited until after the termination of this Agreement.

The Sweater and Activewear Licenses contain the same language in their respective paragraphs 4.8, but insert language that provides for a third event that would trigger Murjani's freedom to license to others. Thus, paragraph 4.8 of both the Sweater and Activewear Licenses is identical to that of the Swimwear License but for the insertion of the language italicized below:

4.8 *Freedom to License.* In the event of termination of this Agreement or the receipt by Murjani of a notice of termination from Licensee, *or in the event of Licensee's failure to given notice of its intention to renew in accordance herewith,* Murjani shall be free to license to others the use of the Mark in connection with the manufacture and sale of Items in the Territory, but only if all advertising and sale of such Items produced pursuant to such third-party agreements is prohibited until after the termination of this Agreement.

In our view, this provision permits no reasonable interpretation but that Murjani agreed not to grant to any third party a license that would permit competition with the plaintiff during the time that the subject licenses were in effect. Were the three licenses intended—as Licensing asserts—to be nonexclusive, the provision would be wholly superfluous, a result contrary to the above-mentioned principle of contract construction that disfavors an interpretation that would render a provision meaningless. *See, e.g., Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assoc.* (1984) 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 468, 472 N.E.2d 315, 318 ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.")

The exclusivity of the licenses is further supported by the following language which appears in each agreement and, *inter alia,* vests Licensing with ownership of plaintiff's designs:

8.6 *Ownership of Designs and Other Materials.* All right, title and interest in

and to samples, sketches, designs and ... other materials furnished by or to [plaintiff] or submitted by or to Murjani whether created by Murjani or [plaintiff], in connection with the Licensed Items, including any modifications or improvements thereof which may be created by Murjani or [plaintiff], are hereby assigned to and shall be the sole property of Murjani as between [plaintiff] and Murjani, and are licensed hereunder solely and exclusively for use in connection with the manufacture and sale of Licensed Items in the Territory. *Murjani may use and permit others to use said designs and other materials in any manner it desires, provided that such use does not conflict with any rights granted [plaintiff] hereunder.* Plaintiff specifically acknowledges that such designs and other materials may be used by Murjani and other licensees on Items in jurisdictions inside and outside the Territory and on products other than Licensed Items anywhere in the World.

¶ 8.6 (emphasis added) Pursuant to this provision, Murjani takes ownership of the very designs plaintiff is obligated to submit to it for approval, and is free to use those designs "in any manner it desires, provided that such use does not conflict with any rights granted [plaintiff] hereunder." If, as Licensing maintains, the parties intended the licenses to be non-exclusive, this provision would permit Licensing to authorize others, not only to compete with plaintiff, but to do so by using plaintiff's own designs. This would seem unlikely.[3]

In opposition to plaintiff's motion, Licensing relies upon other provisions which—in the absence of the "Freedom to License" paragraph—might render the

agreements ambiguous on the question of exclusivity.[4] However, none of these other provisions is rendered a nullity by our interpretation of the language of the "Freedom to License" paragraph.

The first such provision—and the one upon which Licensing primarily relies—reads:

> [Plaintiff] acknowledges that Murjani and its licensees may manufacture, distribute and sell Items which are the same as or similar to Items manufactured and sold by [plaintiff].[5]

Sweater License ¶ 2.1; Activewear License ¶ 2.1 This provision indicates that Murjani (and others so authorized) may make and sell "Items" which are the same as "Items" manufactured and sold by plaintiff. Thus, Licensing contends, one can only conclude that the licenses are not exclusive. Licensing's contention proceeds from the assumption that the parties intended the term "Items" to include garments which not only are of the same style and design as plaintiff's, but which also bear the Mark.

This premise is by no means self-evident from the face of the agreements. Although the term "Items" appears in all three agreements, it is defined only in the Swimwear Agreement. It is there defined as "ladies swimwear." Swimwear License ¶ 1.9 The term "Licensed Items", on the other hand, also appears in each of the agreements in, among other places, the "Freedom to License" provision, and is defined in ¶ 1.10 of each agreement, respectively, as:

> "the Items *bearing the Mark* and which are manufactured by or for Licensee" (Swimwear License ¶ 1.10) (emphasis added)

¶ 20.1; Sweater License ¶ 21.1; Activewear License ¶ 21.1 It is for that same purpose that we refer to ¶ 4.8 as the "Freedom to License" paragraph.

---

**3.** It may be noted that, having determined to confine our inquiry as to the parties' intent to the four corners of the three licensing agreements at issue, we decline to enter into any speculation as to what Murjani might have had in mind when it entered into its November 7, 1984 license with a person not involved in this litigation.

**4.** We recognize—as the agreements expressly provide—that the headings of the provisions as they appear in the agreements were inserted "for convenience only." Swimwear License

**5.** This provision is slightly different in the Swimwear License. There, the words "the same as or" do not appear. Thus it reads:

> [Plaintiff] acknowledges that Murjani and its licensees may manufacture, distribute and sell items which are similar to Items manufactured and sold by [plaintiff].

"women's sweaters and coordinated sweater bottoms *bearing the Mark* and which are manufactured by or for Licensee" (Sweater License ¶ 1.10) (emphasis added)

"misses' performance and activewear which include tennis, bicycle and warm-up suits *bearing the Mark* and which are manufactured by or for Licensee" (Activewear License ¶ 1.10) (emphasis added)

Thus, each agreement is consistent with a definition of "Items" as garments falling within a particular category—respectively, "ladies swimwear", "women's sweaters and coordinated sweater bottoms", and "misses' performance and activewear"— but not bearing the Mark. Accordingly, paragraph 2.1 may reasonably be construed as permitting Murjani to manufacture and sell garments which—but for the Mark—are identical with those manufactured by plaintiff, which construction is wholly consistent with the language of the "Freedom to License" provision unambiguously evidencing the parties' intent that the agreements confer exclusive licenses to the plaintiff.

■ Licensing also relies on certain language of the "grant" provision common to each of the licenses. That provision reads in relevant part (emphasis added):

> 2.1 *License.* Murjani hereby grants to [plaintiff] *a non-assignable license* during the Term of the Agreement, subject to all of the terms and conditions contained in the Agreement to manufacture, distribute and sell the Licensed Items in the Territory and to import Licensed Items into the Territory.

Licensing argues that the use of the indefinite article "a" and the absence of the word "exclusive" manifest the parties' intent that the licenses be non-exclusive. First, as for the use of "a," we observe that the license is not discussed prior to this provision, and the use of the indefinite article would therefore seem appropriate, irrespective of the exclusive or non-exclusive nature of such license. Second, although the

insertion of the word "exclusive" would have rendered this provision determinative, the absence of the word does not as a matter of law render the license nonexclusive. *See Huber Baking Co. v. Stroehmann Bros. Co.* (2d Cir.1958) 252 F.2d 945, 954 ("we ... cannot accept, as a rule of law, the argument ... that a license without provision as to exclusivity is necessarily and under any and all circumstances nonexclusive"), *cert. denied,* (1958) 358 U.S. 829, 79 S.Ct. 50, 3 L.Ed.2d 69. Moreover, construction of the agreements as exclusive does not strip the "grant" provision of meaning or effect.

In brief, we are satisfied that the language of the several agreements unambiguously confers exclusive rights upon the plaintiff, and are comforted in this conclusion by the uncontradicted evidence that Murjani's conduct as licensor was consistent with this interpretation.

## II. THE MOTION TO DISMISS [6]

### A. *Dismissal as to Defendants G.V. Gitano and Group*

The amended complaint names three defendants: Licensing, G.V. Gitano, and Group. In its substantive allegations, plaintiff refers to all three collectively as "Gitano." The motion to dismiss seeks dismissal of the complaint as to G.V. Gitano and Group.

### (1) G.V. Gitano

In the moving papers, defendants' counsel represents that G.V. Gitano, on February 17, 1989, amended its certificate of incorporation thereby changing its name to G.V. Licensing, Inc. (to which we herein refer to as "Licensing"). This comports with paragraph 4 of the amended complaint which states: "On or about February 17, 1989, G.V. Gitano purported to change its name to G.V. Licensing, Inc." We assume from defendants' counsel's representation that Licensing and G.V. Gitano are for the purpose of this litigation one and the same corporation. Based on that assumption, we

---

**6.** Our ruling on plaintiff's motion for summary judgment necessarily moots Licensing's motion in so far as it seeks dismissal of plaintiff's first and second claims, which are based upon the assertion that the licenses are exclusive.

strike the name G.V. Gitano from the caption of this action.

### (2) Group

The motion also seeks dismissal of the amended complaint as against Group, Licensing's parent. Plaintiff primarily advances two reasons why Group should remain a defendant. First, it contends that there is "confusion as to exactly which entity is the licensor." Pltff.'s Mem. in Opp. at 46–47. It would appear that any such confusion has been dispelled by the acquisition documents—produced after the motions had been briefed—pursuant to which Licensing (*sub nom.* G.V. Gitano) acquired Murjani's rights under the licensing agreements. Second, plaintiff contends that Group has been wrongfully selling goods bearing the Mark. In our view, this contention would be relevant only to its claims for: (1) trademark infringement and unfair competition (the third, fourth and fifth claims for relief); and (2) tortious interference with contract and tortious interference with prospective economic advantage (the sixteenth claim for relief). However, for the reasons stated *infra* in Sections II.B. and II.D., the trademark infringement and unfair competition claims fail as a matter of law, as does the sixteenth claim in so far as it seeks recovery on the theory of tortious interference with contract. Accordingly, in the absence of any allegation that Group is liable for the actions of Licensing, we dismiss the complaint as against Group, except for the sixteenth claim in so far as it seeks recovery on the theory of tortious interference with prospective economic advantage.[7]

### B. *The Trademark Infringement and Unfair Competition Claims*

Plaintiff's third and fourth claims seek, respectively, an injunction and damages under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and its fifth claim seeks damages for common law trademark infringement. For reasons that follow, these claims are dismissed.

### (1) Background

The factual allegations underlying each claim are essentially the same. Plaintiff alleges that Licensing and Group—referred to in the amended complaint collectively as "Gitano"[8]—manufactured and sold garments bearing the Mark in violation of plaintiff's exclusive licenses, and that such garments were inferior to those plaintiff had placed on the market, thereby damaging the quality image plaintiff had cultivated. ¶ 56. Moreover, plaintiff alleges, defendants have been offering these garments to plaintiff's customers, thereby causing confusion in the market as to who holds the right to manufacture and sell such garments. ¶¶ 51, 53.

### (2) Discussion

■ Plaintiff does not dispute the well-settled proposition that likelihood of confusion as to the source of the goods in question is an indispensable element of its claims for trademark infringement and unfair competition, whether based upon § 43(a) of the Lanham Act or New York common law. *See, e.g., Wonder Labs, Inc. v. Procter & Gamble Co.* (S.D.N.Y.1990) 728 F.Supp. 1058, 1064; *Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.* (S.D.N.Y.1986) 632 F.Supp. 1525, 1527–28. Plaintiff alleges that such confusion here arises because Licensing—in violation of plaintiff's exclusive licenses—has been manufacturing and selling, and permitting third party licensees

---

**7.** We recognize that both the representation of defendants' counsel and the acquisition documents are outside the pleadings and therefore should not ordinarily be taken into account in the context of a motion brought under Fed. R.Civ.P. 12(b)(6). Accordingly, plaintiff may—to the extent that it considers it appropriate to do so in light of the discovery taken since the amended complaint was filed—promptly challenge the accuracy of our assumption that G.V. Gitano and Licensing are the same for the purposes of this litigation and our conclusion that Licensing is its licensor.

**8.** See Section II.A., *supra.*

such as Group to manufacture and sell, garments bearing the Mark, which garments fall within the categories covered by the licenses. Pltff.'s Mem. at 44–45.

The question of whether or not such conduct may give rise to the likelihood of confusion required to maintain the type of claims here asserted appears squarely to have been addressed by Judge Lasker in *Ballet Makers, Inc. v. United States Shoe Corp.* (S.D.N.Y.1986) 633 F.Supp. 1328, 1331:

> This action raises the question whether confusion of source can exist when the disputed goods bear a label which has been authorized by the owner of the mark in issue, who has also licensed another manufacturer to use the same label. The proposition presented is a puzzling one, demanding resolution of the conflict between the rights of a licensee whose efforts have made the trademarked product successful on the one hand, and the registrant's exclusive rights in the mark on the other hand.

In a detailed and well-reasoned opinion, Judge Lasker thoroughly analyzed the question, ultimately answering it in the negative. Notwithstanding that Licensing specifically referred to *Ballet Makers* in its papers, plaintiff in its opposition makes no reference to the decision. We concur in its apparent view that the decision cannot be faulted, and accordingly dismiss the third, fourth and fifth claims for relief.

### C. *The Fraud and Negligent Misrepresentation Claims*

#### (1) The Fraud Claim

##### (a) Background

Plaintiff claims that it was twice defrauded by Licensing. First, plaintiff alleges that Licensing—by its president—advised plaintiff on April 24, 1989 that it should continue performing under the licenses as it had when Murjani had been the licensor. Thus, plaintiff alleges:

32. At a meeting in New York on April 24, 1989, Haim Dabah, the President of [Group] and [Licensing], advised [plaintiff's] representatives that [plaintiff] should continue conducting its Gloria Vanderbilt business exactly as it had been, and that everything would remain "status quo" at least until after defendants' representatives visited [plaintiff's] facilities in California, which did not occur until July 11, 1989 despite [plaintiff's] repeated requests in May and June 1989 that Gitano's representatives visit [plaintiff's] plant in California.

33. By notice dated May 15, 1989 and letter dated May 18, 1989, Gitano advised [plaintiff] of its newly established guidelines to be used in connection with its approval of [plaintiff's] products, designs, packaging and advertising. According to Gitano's letter, these new guidelines were to commence in January 1990 and stated that [plaintiff] should file certain annual notices with Gitano starting on January 5, 1990. It was clearly contemplated by this letter, as confirmed by Haim Dabah's "status quo" representations, that Gitano's new approval guidelines would become effective in January 1990.

34. On June 12, 1989, counsel for the defendants advised [plaintiff's] counsel in writing that, in defendants' view, the license agreements were nonexclusive. Thereafter, after having advised [plaintiff] that it should continue to conduct its business in the same manner as before, and after having advised [plaintiff] that the new guidelines would not take effect until January 1990, the defendants commenced what appears to be a willful, malicious and intentional pattern of harassment and bad faith conduct towards [plaintiff].

The "pattern of harassment" allegedly included various complaints by Licensing in late June of 1989 that plaintiff had failed to comply with the very approval guidelines that were not to have become effective until January of 1990. Moreover, plaintiff alleges, Gitano—by letter dated July 27, 1989—advised plaintiff that because its entire Fall 1989 line had not been approved,

the sale of such items was to be discontinued immediately. ¶¶ 36–37. According to plaintiff, however, the Fall line had been designed and manufactured according to the timetable in operation when Murjani had been the licensor, *i.e.* in conformity with the "status quo" Licensing had asserted would continue.

The second alleged misrepresentation took place during the latter half of the settlement negotiations that began soon after this action was filed:

44. After the commencement of this lawsuit, Gitano apparently realized that [plaintiff] would not give in to the pressure being applied by Gitano and give up the exclusivity of its agreements, at least not without just compensation. In the Fall of 1989, [plaintiff] agreed in good faith to negotiate with Gitano three new license agreements pursuant to which (a) [plaintiff] would have the exclusive right to sell the licensed items to the lower segment of the market only, being the warehouse clubs, (b) Gitano would have the right to sell the licensed items to the rest of the market, including the mass merchants and speciality stores, and (c) plaintiff would receive significant cash compensation.

45. After negotiations on the details of the new agreements, [plaintiff] and Gitano reached an agreement that settled all the substantive disputes between the parties and only required the parties' agreement on a few minor points before being executed. Indeed, Gitano stated on numerous occasions that the agreement would be finalized and signed. For example, in a May 11, 1990 letter to [plaintiff], Isaac Dabah of Gitano advised [plaintiff] that Gitano would sign the new agreements.

46. Since marketing and sales efforts to customers and potential customers must commence many months before actual sales and deliveries of goods, in about the Spring of 1990 [plaintiff] redirected its marketing efforts in a manner consistent with the new license agreements even though those license agreements were not yet executed. In reliance upon Gitano's assurance and representations that the new agreements would be signed, [plaintiff] did not attempt to sell licensed items to customers and potential customers except those few warehouse club customers that it would be permitted to sell to under the new license agreements.

47. Because [plaintiff] was giving up a substantial portion of its market, the new license agreement required minimum sales in an amount substantially less than those set forth in the original license agreements. Further, the new license agreements eliminated any obligation that [plaintiff] advertise.

48. Upon information and belief, Gitano was aware of [plaintiff's] justifiable reliance on its representations. After [plaintiff] had changed its business plan and strategy, in or about August 1990 Gitano abruptly refused to sign the agreement and called off all negotiations, thereby causing [plaintiff] to incur substantial cost and expense, substantial reduction in [plaintiff's] 1990 sales and preventing [plaintiff] from reaching certain 1990 minimum sales levels provided for in the original license agreements.

49. Upon information and belief, Gitano's refusal to sign the new license agreements was tied to a change in Gitano's business plan for the Gloria Vanderbilt line. Gitano apparently determined that its initial plan to sell the Gloria Vanderbilt line to the higher end of the market was no longer viable.

From the foregoing, plaintiff alleges that, "in the Spring and Summer of 1990 defendants negotiated new license agreements with [plaintiff] in bad faith and falsely represented to [plaintiff] that they would enter into the proposed agreement and, after [plaintiff] justifiably relied [on] defendants' representation, refused to sign the agreements." ¶ 113.

Plaintiff avers that both misrepresentations "were knowingly and intentionally false, were not known to plaintiff to be false when made, and were made with the intention of inducing plaintiff to rely thereon." ¶ 114. The *ad damnum* clause seeks

$50 million in compensatory damages on this claim.

### (b) Discussion

■ To state a claim for fraud, one must allege, *inter alia*, that the defendant intentionally made a material misrepresentation for the purpose of inducing the claimant to rely upon it, and that such reliance resulted in injury. *See, e.g., Murray v. Xerox Corp.* (2d Cir.1987) 811 F.2d 118, 121.

Simply stated, the gravamen of the claim here—in so far as it is based on the "status quo" representation—is that Licensing lulled plaintiff into believing that it could—without risk of termination—continue performing under the licenses in the manner to which it had become accustomed. In our view, the claim is deficient because plaintiff fails to plead any injury suffered as a result of its performance in reliance on such representation. Concededly, plaintiff would be adversely affected should Licensing in this litigation successfully assert that such performance in whole or in part constitutes grounds for termination of the licenses. However, such an assertion would be unavailing were plaintiff to establish that Licensing's "status quo" representation gave rise to an estoppel. In other words, the allegations underlying this aspect of the fraud claim would—if substantiated—give rise to the defense of estoppel rather than to an affirmative claim for damages.

The claim based on the alleged "settlement" misrepresentation must be dismissed as well. In substance, plaintiff alleges that Licensing—by letter dated May 11, 1990—represented that it would sign certain settlement agreements and that plaintiff, relying on its understanding that new licenses would be forthcoming—pursuant to which it would give up certain rights claimed under the old licenses—acted in a more restricted manner which conformed to the agreements it fully expected Licensing would ultimately execute. Conspicuously absent is any allegation that Licensing at any time asked plaintiff to act as though the proposed, albeit unsigned, agreements had been executed, or any allegation that

Licensing was aware that plaintiff intended so to act. In the absence of such allegations we cannot perceive how one can infer that Licensing's purpose in stating that it would sign the settlement agreements was to induce the action plaintiff chose to take.

### (2) The Negligent Misrepresentation Claim

■ The claim of negligent misrepresentation is predicated on the same two misrepresentations that underlie the fraud claim. In so far as the negligent misrepresentation claim is based on the "status quo" representation, it is dismissed for the reason that we dismissed the claim of fraud based on that representation, namely, the failure to plead injury.

In so far as the claim is based on the "settlement" representation made in the spring of 1990, it also must fail, as the requisite element of a special relationship is lacking. "The law of negligent misrepresentation, as enunciated in New York, recognizes that 'generally there is no liability for words negligently spoken' but that 'there is an exception when the parties' relationship suggests a closer degree of trust and reliance than that of the ordinary buyer and seller.'" *American Protein Corp. v. AB Volvo* (2d Cir.) 844 F.2d 56, 63 (quoting *Coolite Corp. v. American Cyanamid Co.* (1st Dep't 1976) 52 A.D.2d 486, 384 N.Y.S.2d 808, 811), *cert. denied*, (1988) 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109. Accordingly, it is well-settled that the "special relationship required by New York law [is] an essential element of a claim of negligent misrepresentation." *Sanitoy, Inc. v. Shapiro* (S.D.N.Y.1989) 705 F.Supp. 152, 155.

Plaintiff here contends that this requirement is met for present purposes because of the parties' contractual relations arising out of the license agreements. ¶ 121. However, plaintiff wholly ignores its own allegations about the status of the parties' relationship at the time the "settlement" representation was made. As is apparent from the face of the amended complaint, that representation occurred approximately eight months after this litigation had been

commenced. As we read the complaint, the litigation was prompted not by an amicable yet insoluble dispute, but by "a pattern of harassment and bad faith conduct" directed against the plaintiff. According to the amended complaint, such conduct included:

(a) requesting repeated inspections of [plaintiff's] plants which have disrupted [plaintiff's] business environment and workplace and adversely affected employee morale, and singling out [plaintiff] as opposed to other licensees with whom there presumably is no dispute with concerning exclusivity, for such inspections;

(b) refusing to show [plaintiff] its styles and samples of other Gloria Vanderbilt products that Gitano has begun manufacturing and selling;

(c) refusing, despite repeated requests, to provide [plaintiff] with guidelines for its lines, when those lines were in the design and sample stage before the sale and production stage started; and

(d) repeatedly threatening [plaintiff] that, unless [plaintiff] agrees that the license agreements are nonexclusive, the harassment and intimidation will continue, stating, for example, that Gitano is the "master" and [plaintiff] is its "servant."

¶ 40. In short, plaintiff's own allegations belie any contention that the parties—at the time the "settlement" representation is claimed to have been made—enjoyed a "closer degree of trust and reliance than that of the ordinary buyer and seller." *American Protein Corp., supra.*

In light of the foregoing, the negligent misrepresentation claim is dismissed.

### D. *The Tortious Interference Claims*

Plaintiff's sixteenth claim for relief seeks compensatory and punitive damages under two theories: tortious interference with contract and tortious interference with prospective economic advantage. ¶¶ 123–25. We sustain the challenge to this claim in so far as plaintiff seeks to recover on the theory of tortious interference with contract, but reject it in so far as it seeks recovery upon the theory of tortious inter-ference with prospective economic advantage.

### (1) Background

Plaintiff rests its claim upon allegations that "the defendants have interfered with and destroyed [plaintiff's] relationships with its customers and its potential customers." Pltff.'s Mem. in Opp. at 38. In this regard, the amended complaint recites the following:

50. After Gitano refused to sign the new license agreements, [plaintiff] discovered that Gitano was selling under the Gloria Vanderbilt label items that are within the scope of [plaintiff's] licenses. Such sales violate the exclusivity of [plaintiff's] license agreements.

51. Gitano has been selling under the Gloria Vanderbilt label items licensed to [plaintiff] by the license agreement in its Gitano stores.

52. In addition, Gitano has either sold or attempted to sell several of the same or similar items offered by [plaintiff] under the Gloria Vanderbilt label to many of [plaintiff's] customers including, among others, the Wholesale Club, J.C. Penney and the Price Club.

53. Other [of plaintiff's] customers and potential customers have been approached by Gitano to purchase from Gitano items licensed to [plaintiff] under the license agreements. Some of these customers and potential customers have refused to buy Gloria Vanderbilt products from [plaintiff] citing to confusion created by Gitano as to who has the right to sell these items.

54. Gitano's efforts to sell [plaintiff's] lines to [plaintiff's] customers has interfered with and damage[d] [plaintiff's] relationships with its customers and potential customers. For example:

(a) A representative of defendants approached the buyer for Price Savers, [a customer of the plaintiff], following which Price Savers reduced its annual order with [plaintiff] by over $600,000;

(b) Montgomery Ward, one of [plaintiff's] longstanding customers for its Gloria Vanderbilt line while Murjani

was the licensor and which also carried lines of women's clothing under the Gitano label, suddenly stopped buying the Gloria Vanderbilt line from [plaintiff] after being approached by a representative of Gitano.

### (2) Discussion

#### (a) Tortious Interference with Contract

■ To state a claim for tortious interference with contract under New York law, the plaintiff must allege: (1) the existence of a valid contract between itself and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of a breach of that contract by the third party; and (4) damages. *See, e.g., Walters v. Fullwood* (S.D.N.Y.1987) (Brieant, C.J.) 675 F.Supp. 155, 159 (citing *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.* (1980) 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445); *Martin Ice Cream Co. v. Chipwich, Inc.* (S.D.N.Y.1983) 554 F.Supp. 933, 945.

Plaintiff's claim under this theory must fall because it fails to plead the existence of a valid contract with a third party. While the complaint alleges that "customers and potential customers" have "refused" to buy plaintiff's goods, that one customer "reduced its annual order," and that another "suddenly stopped buying" from plaintiff, there is no allegation that any customer or potential customer was obligated by contract to behave otherwise, let alone that its failure so to behave constituted a breach of such contract. Accordingly, plaintiff has failed to state a cause of action for tortious interference with contract.

#### (b) Tortious Interference with Prospective Economic Advantage

■ To state a claim under this theory, the complaint must allege that defendant interfered with business relations existing between plaintiff and a third party, *"either*

with the sole purpose of harming plaintiff *or* 'by means that are dishonest, unfair or in any other way improper.'" *Martin Ice Cream Co. v. Chipwich, Inc.* (S.D.N.Y.1983) 554 F.Supp. 933, 945 (emphasis in original) (quoting *Robbins v. Ogden* (S.D.N.Y.1980) 490 F.Supp. 801, 811). Where such interference is intended "'at least in part to advance the competing interest of the interferer' the interference will be excused unless the means employed include 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions and some degrees of economic pressure; they do not, however, include persuasion alone.'" *Strapex Corp. v. Metaverpa N.V.* (S.D.N.Y.1985) 607 F.Supp. 1047, 1050 (quoting *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.* (1980) 50 N.Y.2d 183, 428 N.Y.S.2d 628, 632, 406 N.E.2d 445).

According to the complaint, the conduct from which this claim arises was motivated in part by an interest in competing with the plaintiff. See ¶¶ 21–24, 27, 58, 67. Accordingly, the claim must be supported by sufficient factual allegations from which it may be inferred that "improper means" were employed to effect the alleged interference.

The gravamen of the claim is that Licensing and Group—in marketing garments in violation of plaintiff's exclusive licenses—approached plaintiff's customers and diverted their business to themselves. Licensing contends that such conduct cannot be said to constitute "improper means." However, viewing the allegations in the light most favorable to plaintiff, we cannot say that they permit no set of facts whereby "improper means" could be established. For example, the allegations permit an inference that Licensing and Group, its parent, knew or believed with substantial certainty that the licenses were exclusive, and nevertheless intentionally represented to plaintiff's customers, either expressly or through conduct, that they could lawfully market garments falling within the scope of the licenses.[9] We accordingly are con-

---

**9.** Indeed, it would appear that soon after Licensing acquired the Mark, it had reason to doubt the validity of its asserted position that the licenses were non-exclusive. According to Helen Isaacson, a Murjani account executive who had been involved in monitoring the Swimwear License and negotiating the Sweater and Activewear Licenses:

strained to deny the motion in so far as it seeks dismissal of the sixteenth claim based on the theory of tortious interference with prospective economic advantage.

## CONCLUSION

Plaintiff's motion for summary judgment on its first claim, which seeks a declaratory judgment that its licenses are exclusive, is granted. Licensing's motion to dismiss is granted in so far as it seeks dismissal of the amended complaint's third, fourth, fifth, fourteenth, and fifteenth claims for relief. The name G.V. Gitano, Inc. is struck from the caption, and the complaint is dismissed as against The Gitano Group, Inc., except that the sixteenth claim—seeking damages for tortious interference with prospective economic advantage—asserted against it shall stand.

SO ORDERED.

In the late winter of 1989, shortly after Gitano acquired Murjani's interests in certain Gloria Vanderbilt trademarks and Gloria Vanderbilt licenses, I was contacted by telephone by Gitano's General Counsel concerning [plaintiff's] license agreements. I believe the General Counsel's name was Steven Gerber. Mr. Gerber explained who he was and specifically asked me what was my understanding of the scope of Murjani's license agreements with [plaintiff]. I told Mr. Gerber ... that the negotiations between [plaintiff] and either me or Irene Narissi as representatives for Murjani were always for exclusive licenses.... After I informed Mr. Gerber of these facts, he concluded the conversation and I did not hear from him again.

Isaacson March 28 Supp.Affid. ¶ 3.