**NATIONAL FOOTBALL LEAGUE PROPERTIES, INC.,**
Plaintiff,

v.

**DALLAS COWBOYS FOOTBALL CLUB, LTD., Texas Stadium Corporation, and Jerral W. Jones, Defendants.**

No. 95 Civ. 7951 (SAS).

United States District Court,
S.D. New York.

Feb. 20, 1996.

George T. Conway, III, Stephen R. Black-locks, Wachtell, Lipton, Rosen & Katz, New York City, for Plaintiff National Football League Properties, Inc.

Michael R. Klein, Michael L. Burack, Thomas P. Olson, Robert F. Hoyt, Wilmer, Cutler & Pickering, Washington, DC and Peter E. Calamari, Anthony L. Paccione, Hertzog, Calamari & Gleason, New York City, for Defendants Dallas Cowboys Foot-ball Club, Ltd., Texas Stadium Corporation and Jerral W. Jones.

### OPINION AND ORDER

SCHEINDLIN, District Judge:

Defendants Dallas Cowboys Football Club, Ltd., Texas Stadium Corporation, and Jerral

W. Jones (together, "Defendants") move, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss this lawsuit for failure to state a claim upon which relief can be granted. For the reasons set forth below, this motion is granted in part and denied in part.

## I. *Factual Background*

The National Football League ("NFL") is an unincorporated association comprised of 30 Member Clubs, including the Defendant Dallas Cowboys Football Club, Ltd. ("Cowboys Partnership"), which owns and operates the football team known as the Dallas Cowboys. Effective October 1, 1982, entities owning 26 of the then 28 Member Clubs entered into a trust agreement (the "Trust Agreement") which created the NFL Trust. The Trust Agreement provided that each Member Club would transfer to the NFL Trust the exclusive right to use its "Club Marks" for commercial purposes (with certain limited exceptions). These "Club Marks" include a team's name, helmet design, uniform design, and identifying slogans. *See* Schedule G to Trust Agreement, Exhibit D to Affidavit of Richard W. Cass ("Cass Affid."), Attorney for Defendants, at ¶¶ 2, 4. The Member Clubs also granted to the NFL Trust the exclusive right to use NFL Marks, such as the NFL Shield Design, and the names "NFL," "American Football Conference," "National Football Conference," and "Super Bowl." *See id.* at ¶ 6.

As soon as the NFL Trust was created, it entered into a "License Agreement" with Plaintiff NFL Properties, Inc. that provides Plaintiff with "the exclusive right to license the use of the Trust Property on all types of articles of merchandise and in connection with all types of advertising and promotional programs." License Agreement, Exhibit D to Cass Affid., at 3. The Club Marks of the Cowboys Partnership, like the marks of other Member Clubs, are included in the Trust Property exclusively licensed to Plaintiff.

Plaintiff has been active in promoting the NFL and its Member Clubs, and has issued hundreds of licenses for the use of Club Marks. *See* Complaint at ¶ 18. Plaintiff has also entered into agreements with companies involved in specific product categories—such as soft drinks or charge cards—to be exclusive sponsors of the NFL and its Member Clubs. Sponsors are given the right to use the Club Marks and NFL Marks in advertising, promotion and packaging, to promote themselves as an "Official Sponsor" of the NFL and, in some cases, as an "Official Sponsor" of the Member Clubs. *See id.* The revenue generated from Plaintiff's sale of licensing and sponsorship rights is shared equally by the Member Clubs, which are the sole shareholders of Plaintiff. *See id.* at ¶¶ 2, 19.

Plaintiff contends that Defendants have embarked upon a wrongful plan and scheme which violates the Trust and License Agreements and infringes upon Plaintiff's rights. Specifically, the Complaint alleges that Defendants have entered into a number of highly-publicized contractual arrangements—with Dr. Pepper, Pepsi, and NIKE—that "impermissibly exploit the Club Marks and the NFL Marks, and thus wrongfully misappropriate revenue that belongs to plaintiff and should be shared among all the Member Clubs." *Id.* at 23. The Complaint also alleges that Defendants are negotiating a similar contract with American Express. *See id.* at ¶ 38. Although all of the contractual arrangements Plaintiff mentions are nominally between the "sponsors" and Defendant Texas Stadium Corporation, Plaintiff claims that Defendants are using Texas Stadium as a "stand in" to help the Cowboys Partnership circumvent its obligations under the Trust and License Agreements. *See id.* at ¶ 23.

The Complaint further alleges that Defendants misappropriated Club Marks and NFL Marks in solicitation materials they submitted to potential sponsors. In particular, Plaintiff asserts that Defendants used Club Marks—including the Cowboys "Star" logo—and NFL Marks—including the NFL's "Shield" logo—in the solicitation booklet they sent to Dr. Pepper. *See id.* at ¶ 29. Plaintiff contends that Defendants had no right to use such marks for any purpose. *See id.* at ¶ 29.

The Complaint contains nine counts. Count I alleges that Defendants' actions violate § 43(a) of the Lanham Act. Counts II and III assert, respectively, that Defendants have acted in concert to cause the Cowboys

Partnership to breach express provisions of the Trust and License Agreements and the implied covenant of good faith. Count IV maintains that the Cowboys Partnership has breached its obligations as a settlor of the NFL Trust and as an owner of marks licensed to Plaintiff. Count V alleges that, by engaging in the scheme set forth in the Complaint, the Cowboys Partnership and Defendant Jones have violated fiduciary duties owed to Plaintiff and the other Member Clubs. Count VI asserts that Defendants have been unjustly enriched by their scheme, Count VII that they have misappropriated revenue belonging to Plaintiff, and Count VIII that they have tortiously interfered with contractual rights granted by Plaintiff to its licensees. Finally, Count IX seeks a declaratory judgment establishing that Defendants' actions violate the law, as set forth in Counts I through VIII.[1]

Defendants deny that their actions in any way violate either the Trust Agreement or the License Agreement. In support of their argument, Defendants have submitted copies of the contracts Texas Stadium entered into with Nike, Pepsi, and Dr. Pepper, as well as the contract it eventually entered into with American Express. Defendants maintain that none of these contracts grant sponsors the right to use any Trust Property—namely, either Club Marks or NFL Marks; indeed, they note that the contracts with Pepsi, Nike and American Express explicitly state that the sponsor is not entitled to use any Club Marks. *See* Pepsi Contract, Ex. F to Cass Affid., at ¶ 12; Nike Contract, Ex. G to Cass Affid., at ¶ 3(H)(II); American Express Contract, Ex. H to Cass Affid., at ¶ 8. Defendants argue that all of Plaintiff's claims are based on false assertions that are refuted by the underlying contracts, and that Plaintiff's action should therefore be dismissed.

## II. *Legal Standard*

■ In evaluating a motion to dismiss, courts must accept as true the factual allegations contained in the complaint. *See Cohen*

*v. Koenig,* 25 F.3d 1168, 1171 (2d Cir.1994). All reasonable inferences must be drawn in favor of the non-moving party on such a motion. *See Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). Moreover, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). While courts ordinarily consider only the facts alleged in the complaint and documents incorporated therein, they may also consider documents which are integral to a plaintiff's claims. *See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991).

■ The contracts submitted by the Cowboys are clearly "integral" to Plaintiff's claims. The Complaint repeatedly alleges that Defendants have unlawfully licensed Club Marks and NFL Marks to Pepsi, Nike, and Dr. Pepper. *See* Complaint at ¶¶ 20–23, 29–31, 47–49, 53–54, 72, 75. The fact that the contracts were submitted by Defendants, rather than Plaintiff, is of no moment. Where a "plaintiff fails to introduce a pertinent document as part of [its] pleading, defendant may introduce the exhibit as part of [its] motion attacking the pleading." *I. Meyer,* 936 F.2d 759, 762 (quoting 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1327, at 489 & n. 15).

■ "An appended document will be read to evidence what it incontestably shows once one assumes that it is what the complaint says it is (or, in the absence of a descriptive allegation, that it is what it appears to be)." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir.1995). The contracts submitted by Defendants certainly appear to be the written agreements discussed throughout the Complaint. To the extent that the content of the contracts conflicts with allegations about those contracts made in the Complaint, the actual language of the contracts must

---

1. Plaintiff seeks, *inter alia,* compensatory damages in an amount not yet determined but believed to be in excess of $100 million, treble damages under the Lanham Act, at least $200 million in punitive damages, and a permanent injunction enjoining Defendants from engaging in conduct similar to that alleged in the Complaint. *See* Complaint at ¶¶ I–IV (Prayer for Relief).

control. *See Ferber v. Travelers Corp.*, 802 F.Supp. 698 (D.Conn.1992). However, Plaintiff is not precluded from demonstrating that terms contained in the contracts are contradicted by the actual conduct of the contracting parties. *Cf. Gant*, 69 F.3d at 675 (noting that by attaching a document to a complaint, a plaintiff does not admit as true all assertions contained therein).

## III. *Analysis*

Plaintiff repeatedly alleges in its Complaint that Defendants, through Texas Stadium, have granted sponsors the right to use the mark "Texas Stadium, home of the Dallas Cowboys." *See* Complaint at ¶¶ 31(a), 38, 47–48, 53. Plaintiff also alleges that Defendants have "authoriz[ed] NIKE branded apparel to be worn on the field and on the sidelines during televised NFL games." *Id.* at ¶ 49. An examination of the contracts at issue reveals that they neither grant the use of the phrase "home of the Dallas Cowboys" nor authorize NIKE apparel to be worn on the Dallas Cowboys' sidelines. Defendants contend that because the contracts do not authorize the alleged misconduct, Plaintiff's entire case must be dismissed.

### A. *Breach of Contract*

█ Plaintiff's claim for breach of contract withstands Defendants' motion to dismiss for a number of reasons. First, although the contracts do not contain the language discussed above, they do grant other rights which may violate the Trust and License Agreements. The Pepsi contract grants Pepsi the right to use a logo which says "Texas Stadium/Home of America's Favorite Team," which Plaintiff claims is a Club Mark.

The logo licensed for use by American Express contains a star which Plaintiff claims is similar to the star that appears on the Dallas Cowboys' helmets.[2] Accepting Plaintiff's allegation that Texas Stadium entered into these contracts as a "stand in" for the Cowboys Partnership,[3] and drawing all inferences in favor of Plaintiff, the use of either of these logos would violate the Trust and License Agreements.

Second, the Complaint alleges that Defendants engaged in conduct which might violate the Trust and License Agreements—namely, a concerted campaign to create the impression that companies such as NIKE and Pepsi were sponsors of the Dallas Cowboys organization. During a nationally televised game, Defendant Jones, who controls both the Cowboys Partnership and Texas Stadium Corporation, allegedly escorted the CEO of NIKE to the Dallas Cowboys' sideline while both men prominently wore NIKE branded attire. *See id.* at ¶ 36. The Complaint further alleges that Jones ordered team personnel not to dress in apparel licensed by Plaintiff during this game, so that "[m]illions of television viewers observed no apparel brand other than NIKE" on the Cowboys' sideline. *Id.* at ¶¶ 36(e), 36(g). Hence, despite contractual provisions to the contrary, in *practice* Defendants may have authorized NIKE apparel to be worn on the Dallas Cowboys' sideline, adjacent to players wearing the Club Marks.

Plaintiff also alleges that, in furtherance of their scheme to mislead the public, the Dallas Cowboys and NIKE jointly issued a press release in which the CEO of NIKE referred to the agreement as one with the "Dallas Cowboys"; and that Defendant Jones an-

2. The Texas Stadium logo American Express is licensed to use features a picture of the stadium, with the words "Texas Stadium" beneath it. The star is superimposed on the letter "D" in the word "Stadium." Defendants assert that: 1) the star that appears on this logo is not similar to the star that appears on the Dallas Cowboys' helmets; and 2) a star is so generic a symbol (especially in Texas, which is known as the "Lone Star" state) that nobody would associate it exclusively with the Dallas Cowboys. At this stage of the litigation, it is too early to determine whether the star contained in the Texas Stadium logo is similar to that appearing on the Dallas Cowboys' helmet. Moreover, where the star is used in

conjunction with other symbols that are clearly associated with the Dallas Cowboys (e.g., a picture of Texas Stadium), I cannot conclude as a matter of law that it is too generic a symbol to serve as a distinctive logo for the Dallas Cowboys.

3. The claim that Texas Stadium is a "stand in" for the Cowboys Partnership is bolstered by the allegation that Defendant Jones controls both *Texas Stadium and the Cowboys Partnership, see* Complaint at ¶ 5, and the fact that the Dallas Cowboys are the only professional sports team that plays in Texas Stadium.

nounced that the entire Cowboys organization drinks Pepsi, and posed for pictures at a press conference dressed in a "shirt emblazoned with a Cowboys Club Mark and boots emblazoned with a Pepsi logo...." *Id.* at ¶¶ 36(d), 31(c), 31(d). All of the above conduct may constitute an impermissible use of Club Marks (e.g., the name "Dallas Cowboys" and the team's uniforms), since under the Trust and License Agreements the Cowboys Partnership gave Plaintiff the *exclusive* right to use these marks for commercial purposes. At a minimum, alleging such conduct is sufficient to state a claim for breach of the implied duty of good faith, which constitutes a breach of contract under New York law. *See Canstar v. J.A. Jones Constr. Co.,* 212 A.D.2d 452, 622 N.Y.S.2d 730, 731 (1st Dep't 1995); *Fasolino Foods Co. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1058 (2d Cir.1992).

Finally, the Complaint alleges that Defendants misappropriated Club Marks and NFL Marks in solicitation materials they sent to potential sponsors. Specifically, the Complaint states that Defendants used the Club's "Star" logo and the NFL's "Shield" logo in a solicitation booklet they sent to Dr. Pepper. *See* Complaint at ¶ 29. Because the Trust and License Agreements give Plaintiff the *exclusive* right to use these Marks for commercial purposes, Defendants may have breached these agreements by using these Marks in a solicitation booklet. Defendants' counsel conceded that his clients' use of the Marks in solicitation materials was "[a]bsolutely inappropriate" and "probably violated their obligations...." Transcript of Oral Argument, February 15, 1996, at 11.[4]

### B. *The Lanham Act*

■ Plaintiff also alleges that Defendants violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides in relevant part:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any com-

bination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, *sponsorship, or approval* of his or her goods, services, or commercial activities of another person, ...

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act (emphasis added).

Such a claim requires only a valid trademark and a likelihood of confusion on the part of the public. *See Nike, Inc. v. Just Did It Enters.,* 6 F.3d 1225, 1227 (7th Cir.1993).

Plaintiff has the exclusive right to use NFL Marks and Club Marks for commercial purposes. Plaintiff clearly alleges that Defendants have commercially exploited Club Marks and NFL Marks by using them to solicit a sponsorship agreement and by authorizing their use in agreements with Dr. Pepper, Pepsi, NIKE. *See* Complaint at ¶¶ 29, 31, 33. As described above, Plaintiff also alleges that Defendants, through various press conferences and public appearances, have sought to create the impression that a relationship exists between the Cowboys and various sponsor companies. *See id.* at ¶¶ 31(b), 31(c), 31(d), 36. Of course, whether the marks used by Defendants were NFL Marks or Club Marks is a question of fact.

There are decisions of this Court which suggest that an exclusive licensee of the right to distribute goods bearing a certain trademark cannot bring an action under § 43(a) of the Lanham Act against the trademark owner for permitting the use of the trademark in violation of the licensing agreement. *See L.G.B. Inc. v. Gitano Group, Inc.,* 769 F.Supp. 1243, 1249 (S.D.N.Y.1991); *Ballet Makers, Inc. v. United States Shoe Corp.,* 633 F.Supp. 1328, 1335 (S.D.N.Y.1986); *Silverstar Enters., Inc. v. Aday,* 537 F.Supp.

---

4. While conceding that this conduct violated the Trust and License Agreements, counsel argued that it was a single isolated incident and constituted an innocent mistake. *See* Transcript of Oral Argument, February 15, 1996, at 11.

236, 241 (S.D.N.Y.1982). The reasoning of these cases is that where the trademark owner, who is the source of the goods, authorizes the use of the mark for "genuine" goods, there can be no likelihood of confusion as to the *source* of the goods and, consequently, the quality of the goods.[5]

Plaintiff's interest in the marks, however, is in authorizing the international corporate sponsorship of goods, not in selling goods. In this context the concepts of genuine goods, quality of goods, and source of goods have little significance. The quality, source, or genuineness of Pepsi or NIKE shoes, for example, are primarily reflected by their respective marks regardless of whether they are sponsored by the Cowboys or the NFL. As neither Plaintiff nor Defendants sell or manufacture goods, it makes little sense to focus on the source of the goods as the courts did in *Ballet Makers* and the other cited cases. *See Mastercard Int'l Inc. v. Sprint Communications Co.*, 1994 WL 97097 at *4 (S.D.N.Y.), *aff'd*, 23 F.3d 397 (2d Cir.1994) (rejecting the relevance of the source of goods in the sponsorship context). Rather, in the sponsorship context, the focus should be on the nature of Defendants' activities regarding marks which Plaintiff has the exclusive right to commercially exploit. Plaintiff has pleaded that Defendants have used NFL Marks and Club Marks in a manner which is likely to confuse the public as to Plaintiff's "sponsorship or approval" of Dr. Pepper, Pepsi, and NIKE. *See* Complaint at ¶¶ 47–50. These allegations are sufficient to state a cause of action under the broad language of § 43(a) of the Lanham Act.

### C. *Other Claims*

Plaintiff's other claims arise out of the same set of operative facts as the breach of contract and Lanham Act claims, and are likewise not defeated by the contracts Defen-

---

**5.** The principle that trademark law does not reach the unauthorized sale of genuine goods bearing a true mark has been adopted by the Second Circuit. *See Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir.1992).

**6.** At oral argument, Plaintiff's counsel cited *W.T. Grant Co. v. Uneeda Doll Co.*, 19 A.D.2d 361, 243 N.Y.S.2d 428 (1st Dep't 1963), *aff'd*, 15 N.Y.2d 571, 254 N.Y.S.2d 834, 203 N.E.2d 299 (1964),

dants have submitted. However, Defendants have raised independent objections to several of Plaintiff's common law claims, two of which are convincing.

#### i. *Breach of Implied Covenant of Good Faith*

■ Defendants seek to dismiss Plaintiff's claim for breach of the implied duty of good faith because it is duplicative of Plaintiff's breach of contract claim. "Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Fasolino Foods*, 961 F.2d at 1056. Plaintiff's separate claim for breach of the implied duty of good faith is therefore dismissed as redundant. *See Apfel v. Prudential–Bache Sec.*, 183 A.D.2d 439, 583 N.Y.S.2d 386, 387 (1st Dep't 1992), *modified on other grounds and aff'd*, 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (1993) ("cause of action alleging a breach of good faith is duplicative of a cause of action alleging breach of contract, since every contract contains an implied covenant of good faith and fair dealing").[6]

#### ii. *Breach of Obligations as Settlor of the NFL Trust Agreement and as Licensor of the Cowboys Club Marks*

■ Defendants contend that Count IV of the Complaint should be dismissed because neither a settlor of a trust nor a licensor is under any duty—beyond that set forth in the underlying trust or licensing agreement—to refrain from taking steps that will reduce the value of the trust property or license. In support of its claim, Plaintiff cites a single case involving a settlor's deliberate interference with a trustee's efforts to fulfill his duties under the trust agreement. *See Vandyke v. Webb*, 167 A.D. 445, 152 N.Y.S. 508 (1st Dep't 1915). The cause of action recog-

---

for the proposition that Plaintiff could plead both breach of contract *and* breach of the implied duty of good faith. *See* Transcript of Oral Argument, February 15, 1996, at 65–66. Plaintiff's reliance on this case is misplaced. *W.T. Grant Co.* merely permits hypothetical, or alternative pleadings; it does not authorize the pleading of duplicative causes of action.

nized in *Vandyke* is nothing more than a simple breach of the implied duty of good faith. The case does not support Plaintiff's view that a settlor has any duty independent of its obligations under a trust agreement, which include the implied duty of good faith. Count IV is therefore dismissed.[7]

### iii. *Misappropriation of Property*

Defendants assert that the Complaint fails to state a claim for misappropriation of property because it does not adequately identify the property rights allegedly misappropriated. Further, they argue that this claim fails because New York does not recognize a cause of action for the misappropriation of intangible assets. Neither of these arguments has merit. The first fails because the Complaint clearly alleges that Defendants have misappropriated revenue belonging to Plaintiff. *See* Complaint at ¶ 75. The second is irrelevant because revenue is not an "intangible asset."

■ Even if the Complaint only alleged that Defendants have misappropriated Club Marks, which are intangible, dismissal would not be warranted. Misappropriation claims that concern intangible rights are generally not recognized. *See Ippolito v. Lennon,* 150 A.D.2d 300, 542 N.Y.S.2d 3, 6 (1st Dep't 1989). However, in the context of unfair competition, a plaintiff may state a cause of action for the misappropriation of an intangible asset, at least where it is ultimately embodied in a tangible product. *See Standard & Poor's Corp. v. Commodity Exchange,* 683 F.2d 704, 710 (2d Cir.1982).

### iv. *Tortious Interference*

■ Defendants contend that the Complaint fails to allege the elements of tortious interference with contract. A plaintiff in such an action must allege that: i) a valid contract existed between plaintiff and a third party; ii) defendant knew of this contract; iii) defendant intentionally induced the third party to breach the contract or otherwise render performance impossible; and iv) plaintiff suffered damages. *See Kronos, Inc.*

*v. AVX Corp.,* 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993); *Enercomp, Inc. v. McCorhill Publishing, Inc.,* 873 F.2d 536, 541 (2d Cir.1989).

■ *Kronos* suggests that a plaintiff can state a claim for tortious interference with contract without actually alleging that the third party breached its contract. However, a plaintiff must at least allege that the defendant's interference made the contract impossible to perform, or that the defendant induced the third party to render performance impossible. *See Museum Boutique Intercontinental, Ltd. v. Picasso,* 886 F.Supp. 1155, 1163 & n. 19 (S.D.N.Y.1995).

■ The Complaint meets this requirement. Plaintiff alleges that Defendants' intentional conduct has "interfered with and caused the violation and derogation of contractual rights granted by plaintiff to its licensees and sponsors." Complaint at ¶ 78. Plaintiff has entered into contracts that make companies *exclusive* sponsors of the NFL and its Member Clubs for specific product categories. Plaintiff alleges that Defendants, by making unilateral arrangements with the direct competitors of these exclusive sponsors, have made it impossible for Plaintiff to honor its contractual obligations. Accordingly, Plaintiff's claim for tortious interference withstands Defendants' motion.

### IV. *Conclusion*

For the reasons set forth above, Defendants' motion is granted in part and denied in part.

SO ORDERED.

---

7. Of course, if Plaintiff can establish that either Defendant Jones or the Cowboys Partnership owed it a fiduciary duty, and breached this duty, it may be able to recover under Count V ("Breach of Fiduciary Duty").