**MJ & PARTNERS RESTAURANT LIMITED PARTNERSHIP and 23 Food, Inc., Plaintiffs,**

v.

**David ZADIKOFF, Jump, Inc. and Michael Jordan, Defendants.**

**Michael JORDAN and Jump, Inc., Plaintiff–Intervenors,**

v.

**MJ & PARTNERS RESTAURANT LIMITED PARTNERSHIP and 23 Food, Inc., Defendants.**

No. 97 C 8008.

United States District Court, N.D. Illinois, Eastern Division.

May 6, 1998.

Jack Samuel Tenenbaum, Brian D. Roche, Andrew Hartman, Valerie Nicolle Childers, H. Brian Centeno, Sachnoff & Weaver, Ltd., Chicago, IL, for MJ & Partners Restaurant Ltd. Partnership.

Alan Warren Brothers, Hubert O. Thompson, Brothers & Thompson, P.C., Chicago, IL, for David Zadikoff.

Frederick J. Sperling, Sondra A. Hemeryck, Andrew M. Perlman, Schiff, Hardin & Waite, Chicago, IL, for Michael Jordon, Jump, Inc.

### MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiffs MJ & Partners Restaurant Limited Partnership (MJ & Partners) and 23

Food, Inc. (23 Food) filed their original complaint against defendant David Zadikoff (Zadikoff) seeking injunctive and monetary relief for alleged acts of trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count I), unfair competition and misappropriation under Illinois common law (Counts II and III), deceptive business and trade practices under 815 ILCS § 505/1 & 510/1 *et seq.* (Count IV), breach of fiduciary duty (Count V), and misappropriation of trade secrets under the Illinois Trade Secrets Act, 765 ILCS 1065/2(d) (Count VI). At issue is Zadikoff's motion to dismiss the original complaint under Fed.R.Civ.P 12(b)(6).[1] For the reasons stated herein, Zadikoff's motion is granted in part and denied in part.

### BACKGROUND

In considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, we accept all well-pled factual allegations in the complaint as true and draw all reasonable inferences from these facts in favor of the plaintiff. *Travel All Over the World, Inc. v. The Kingdom Of Saudi Arabia,* 73 F.3d 1423, 1429 (7th Cir.1996). Read in this light, the facts are as follows.

Jordan is a resident of Illinois and president of plaintiff Jump, a District of Columbia corporation with its principal place of business in Illinois. 23 Food, Inc. (23 Food) is an Illinois corporation with its principal place of business in Illinois. MJ & Partners is an Illinois limited partnership with its principal place of business in Illinois. Zadikoff is an individual residing and conducting business in this judicial district.

Jump and 23 Food are signatories to a restaurant license agreement dated September 12, 1990 (restaurant license agreement). The agreement grants 23 Food the fight to use Jordan's name, likeness, voice, and per-

sona (collectively, Name), providing in relevant part as follows:

> Subject to the terms and conditions hereinafter set forth, Jump hereby grants to [23] Food, and Food hereby accepts from Jump, the exclusive right and license in the Chicago metropolitan area (herein defined as in the Cook, Lake, DuPage, Will, Kane and McHenry Counties, Illinois) to use the Name directly or through a partnership, joint venture or other entity of which Food is a partner, joint venturer, owner, or other equity holder (a "Restaurant Entity") to own and operate the Restaurant Business.

(am.cplt.exh. A ¶ 1). The restaurant license agreement further stated that Jump "will not take any action or enter into any new agreements in the restaurant industry that in any manner violates or interferes with the rights granted to Food by Jump hereunder" (*id.* at ¶ 2). MJ & Partners is a sublicensee under the agreement. Jump and 23 Food also entered into a side agreement dated September 12, 1990, that supplements the restaurant license agreement. This agreement states that

> during the term of the Restaurant License Agreement neither Jump nor any of its affiliates shall grant, sell, assign or otherwise entitle any person, firm, corporation or other entity the right to open any restaurant based on the Name within Cook, Lake, DuPage, Will, Kane and McHenry Counties, Illinois.

(am.cplt.exh. B).

In April 1993, plaintiffs opened Michael Jordan's Restaurant at the corner of LaSalle and Illinois Streets in Chicago. The restaurant has become one of the most visited tourist attractions in Chicago and Jordan has personally received significant monetary benefits in the form of royalty payments, pursu-

---

**1.** After the original complaint was filed, plaintiff-intervenors Michael Jordan (Jordan) and Jump, Inc. (Jump) filed a complaint seeking declaratory judgment. In our February 25, 1998 memorandum and order, we granted Jump's summary judgment motion, declaring that under the terms of the restaurant licensing agreements, Jump was entitled to withhold approval of the opening of additional restaurants in Chicago based on the Name. Thereafter, plaintiffs filed an amended complaint adding Jordan and Jump as defendants, including a seventh count for declaratory judgment against them, and adding additional specific allegations. To the extent that the changes incorporated in the amended complaint are relevant to our evaluation of Zadikoff's motion to dismiss, we adopt the allegations of the amended complaint. Fed.R.Civ.P. 15(a); *see Kelley v. Crosfield Catalysts,* 135 F.3d 1202, 1204 (7th Cir.1998) (stating that an amended pleading supersedes the original pleading).

ant to the restaurant licensing agreement. Based on the success of the restaurant plaintiffs have been planning to open several additional restaurants and nightclubs based on the Name in the Chicago metropolitan area, which they believe could result in sales of approximately 60 to 80 million dollars per year.

Since its opening, Zadikoff has performed the duties of chief executive for Michael Jordan's Restaurant.[2] Zadikoff's responsibilities include, but are not limited to, determining the hours of operation, selecting vendors and suppliers, determining the restaurant's menu, selecting prices for goods and services, setting labor policies (including wages, hiring, supervising, assigning, promoting, and discharging of employees), formulating marketing and advertising plans, establishing quarterly and annual budgets, handling on-site relations with private investors and relations with celebrities, and planning promotional events. Zadikoff also has the authority to sign corporate checks on the restaurant's bank accounts.

As chief executive, Zadikoff received the following information: the price and cost to plaintiffs of products and goods purchased from suppliers for the restaurant, the sales and employee history of the restaurant and retail store, the terms and conditions offered by suppliers from which plaintiffs purchased products, the gross profit for every item sold in the restaurant, the restaurant's revenues and expenses, financing agreements, the list of investors in 23 Food and MJ & Partners, the restaurant's marketing plans, and special customer relationships.

Plaintiffs allege that while continuing to work on behalf of Michael Jordan's Restaurant, Zadikoff has made plans with Jordan to open a new restaurant in Chicago using the Name. According to plaintiffs this restaurant is to be located at 160 North Loomis Street in Chicago (hereinafter referred to as the Loomis restaurant). The ownership of the Loomis restaurant is structured in the following way. Jordan and Jump own 100 percent of JCI, L.L.C. (JCI), a Delaware limited liability company. Jump and JCI own 100 percent of Treadwater, L.L.C. (Treadwater), a Delaware limited liability company which owns the land and the building where the Loomis restaurant is located. Treadwater leased the building where the Loomis restaurant is located to Emanon, L.L.C. (Emanon), a Delaware limited liability company. Emanon is owned 95 percent by Jump and JCI, and 5 percent by Cornerstone Management & Consulting, Inc. (Cornerstone). Zadikoff is the chairman of Cornerstone and has absolute discretion to act on behalf of Cornerstone in connection with its dealings with Jordan. Emanon entered into a management agreement with Cornerstone to provide and control the overall management of the Loomis restaurant.

On or about January 31, 1997, Zadikoff caused an easement to be recorded concerning the property formerly known as the Pickle Factory at the intersection of Ogden Avenue, Lake and Randolph Streets in Chicago (easement). Paragraph 11 of the easement states as follows:

Parcel 1 Owner's [Treadwater's] right to obtain the exclusive use of any parking spaces located on [the western portion of the property] shall terminate effective on the date ... which is the earliest of: ... (y) the date Parcel One ceases to be owned by a Cornerstone Entity, and (z) the date Jordan and/or Jordan Affiliates cease to own in the aggregate at least ten percent (10%) of the Cornerstone Entity which owns Parcel 1. "Cornerstone Entity" means any partnership, corporation, limited liability company or other entity which one or more of Michael Jordan of the Chicago Bulls NBA team ("Jordan"), Jordan Affiliates, David Zadikoff and Jonathan Albert controls. "Control" means, with respect to any partnership, corporation or limited liability company, possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of, and to make all material business decisions (in-

---

**2.** Of course, Zadikoff disputes this characterization, claiming the contracts that govern his employment (which should be incorporated as part of plaintiffs' complaint) demonstrate that he is merely an independent contractor. However, since Zadikoff raises this argument as part of his substantive response to plaintiffs' breach of fiduciary duty claim, we will address it below as we evaluate the merits of the motion to dismiss.

cluding without limitation decisions pertaining to sale, development, leasing and financing) affecting such partnership, corporation, limited liability company or other entity.

(am.cplt.exh. C, ¶ 11).

Plaintiffs allege that Zadikoff has taken the following actions with respect to the Loomis restaurant: he initiated a "whispering campaign" regarding the opening of the Loomis restaurant in Chicago; he released information to the media regarding the opening of the Loomis restaurant (*id.*, exh. E); he and Jordan once intended to name the restaurant "Restaurant J" (*id.*, exh. D); and he and Jordan strategically selected the Ogden Avenue location to benefit from its proximity to the United Center, home of the Chicago Bulls, the large number of sports fans that use that thoroughfare to the United Center from the north and northwest, the location's neighbor, Hoops, a highly regarded basketball facility used regularly by visiting NBA teams, and its proximity to the James Jordan Boys Club. Plaintiffs further allege that Zadikoff and Jordan plan to utilize the Name in the following ways: by serving "Carolina Style Food," to take advantage of the fact that Jordan is from North Carolina; by modeling the Loomis restaurant after other celebrity-owned restaurants such as "Georgia" in Los Angeles, which is owned by a retired NBA star; by having Jordan personally appear to promote the restaurant, and displaying Jordan's name on a publicly-displayed personal humidor inside the restaurant; and by making Jordan's vehicles, many of which bear vanity license plates, "clearly visible" outside the Loomis restaurant when Jordan is visiting.

Plaintiffs have not consented to the use of the Name in connection with any restaurant other than Michael Jordan's Restaurant. Plaintiffs have demanded that Zadikoff cease his activities with respect to the Loomis restaurant, but Zadikoff has not done so.

## DISCUSSION

In order to have a claim dismissed under Rule 12(b)(6) the moving party must show that plaintiffs complaint fails "to state a claim upon which relief can be granted." Fed. R.Civ.P. 12(b)(6). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not its merits. *Triad Assoc. Inc. v. Chicago Housing Authority*, 892 F.2d 583, 586 (7th Cir.1989), *cert. denied*, 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). A complaint should not be dismissed for failure to state a claim "unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In order to withstand a motion to dismiss a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Gray v. County of Dane*, 854 F.2d 179, 182 (7th Cir. 1988).

In Count I of the complaint plaintiffs claim that Zadikoff's unauthorized use of the Name in connection with a restaurant in Chicago violates the Lanham Act, 15 U.S.C. § 1125(a). Section 1125(a) provides a cause of action to plaintiffs who believe that another person's use of the same mark will likely cause confusion as to the affiliation of that person with the plaintiff. Specifically, § 1125(a) provides in relevant part that:

(1) Any person who, on or in conjunction with any goods or services, ... uses in commerce any word, term, name, symbol, or device, ... or any false designation of origin ... which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ...

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a). This claim requires only a valid trademark and a likelihood of confusion on the part of the public. *National Football League v. Dallas Cowboys*, 922 F.Supp. 849, 854 (S.D.N.Y.1996).

There is no dispute over the validity of the trademark in this case. Rather, the crux of the parties' disagreement is whether plaintiffs have sufficiently alleged a likelihood of confusion. It is well established that in order to succeed on a claim under § 1125(a),

a plaintiff must prove a "likelihood" of confusion, not a mere "possibility" of confusion. *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 619 (7th Cir.1995). Because a trademark is an identifier rather than a property "right," the use of a competitor's mark that does not cause confusion as to source is permissible. *Libman Co. v. Vining Industries Inc.*, 69 F.3d 1360, 1362 (7th Cir.1995), *cert. denied*, 517 U.S. 1234, 116 S.Ct. 1878, 135 L.Ed.2d 173 (1996). A plaintiff must prove that a likelihood of confusion would occur to a significant number of consumers and not merely in an isolated situation. *Door Systems, Inc. v. Pro–Line Door Systems, Inc.*, 83 F.3d 169, 173 (7th Cir.1996).

Zadikoff argues that the "confusion" required by the Lanham Act is confusion as to the affiliation or connection of the alleged infringer with the *owner* of the allegedly infringed mark. In this case the owner of the Name is Jordan's wholly-owned company, Jump. Thus, Zadikoff argues that in order to establish a violation of § 1125(a), plaintiffs must show that Zadikoff's alleged use of the mark will be likely to cause confusion as to Jump's (and, by association, Jordan's) affiliation with Zadikoff and the Loomis restaurant. Zadikoff contends that since there is no dispute that Jordan in fact owns the companies that are developing the Loomis restaurant, there can be no confusion as a matter of law and we therefore must dismiss Count I.

Plaintiffs counter that the "likelihood of confusion" standard is designed to protect the public's ability to rely on a trademark as indicative of the *source of goods*, irrespective of who owns the mark. Thus, a violation of § 1125(a) can occur where the "person" who uses the mark is likely to be confused with "another person" who has been exclusively licensed to offer particular goods or services. Here it is plaintiffs, not Jump or Jordan, who are the source of goods and services connected with any restaurant using the Name in the metropolitan Chicago area. Thus, plaintiffs argue that Zadikoff's use of the Name is likely to cause confusion as to whether plaintiffs or Zadikoff are exclusively authorized to use the Name in connection with a restaurant in Chicago. On this basis plaintiffs assert that their complaint states a claim under § 1125(a).

This case thus raises the issue of whether an exclusive licensee of a trademark can state a claim under § 1125(a) when the owner of the mark has authorized the use of the mark by the "person" who is doing the alleged infringing. In other words, at issue is whether plaintiffs can state a claim against Zadikoff when the potential confusion arises due to the fact that Zadikoff, in conjunction with Jordan, plans to open a restaurant allegedly using the mark, in violation of plaintiffs' exclusive restaurant license agreement.

Although the Seventh Circuit has not squarely addressed this issue, other courts have evaluated the likelihood-of-confusion issue in the context of trademark licensees. These cases suggest that a licensee of the right to distribute goods and services bearing a certain trademark cannot bring an action under § 1125(a) against the trademark owner and/or its affiliates for using the trademark in violation of the licensing agreement. *See L.G.B. Inc. v. Gitano Group, Inc.*, 769 F.Supp. 1243, 1249 (S.D.N.Y.1991); *Ballet Makers, Inc. v. United States Shoe Corp.*, 633 F.Supp. 1328, 1335 (S.D.N.Y.1986); *Silverstar Enterprises Inc., v. Aday*, 537 F.Supp. 236, 241 (S.D.N.Y.1982).

Judge Lasker's opinion in *Ballet Makers* has become the leading authority on this issue. In that case plaintiff Ballet Makers was given the license to sell and distribute certain Capezio products by defendant U.S. Shoe. U.S. Shoe subsequently entered into another licensing agreement with a different company to sell and distribute products bearing the Capezio mark. Ballet Makers sued under § 1125(a) of the Lanham Act, claiming that the subsequent licensee's use of the Capezio mark created the likelihood of consumer confusion and thus constituted unfair competition. The court framed the issue as follows:

> This action raises the question whether confusion of source can exist when the disputed goods bear a label which has been authorized by the *owner* of the mark in issue, who has also licensed another manufacturer to use the same label. The proposition is a puzzling one, demanding resolution of the conflict between the rights of a licensee whose efforts have made the

trademarked product successful on the one hand, and the registrant's exclusive rights in the mark on the other hand.

633 F.Supp. at 1331.

After reviewing the case law, the court stated that "confusion exists only where the public believes that a product is sponsored by the mark's owner when in fact it is not." *Id.* at 1334. This definition, the court concluded, "reflects the purpose underlying federal trademark law which the 'confusion' standard is designed to effectuate, namely, protecting the public's ability to rely on a trademark as indicative of the source of the goods, which in turn, is indicative of the goods' quality." *Id.* Applying this framework, the court held that since the subsequent licensee was authorized by U.S. Shoe to produce and distribute goods bearing the Capezio mark, those goods accurately designated the correct source of the goods and therefore did not create a likelihood of confusion as a matter of law. *Id.* at 1335. The court dismissed Ballet Makers § 1125(a) claim against both U.S. Shoe and the subsequent licensee.

Thus, under *Ballet Makers,* the holder of the mark is the "source" of the goods even where a separate licensee has been authorized to actually produce the trademark-holder's product. We therefore agree with Zadikoff that the relevant inquiry under § 1125(a) is whether the public is likely to be confused about whether a product (in this case restaurant services) is sponsored by the mark's owner (in this case Jordan through Jump). Following *Ballet Makers,* we do not think that plaintiff's complaint can establish the likelihood of such confusion as a matter of law.

As an initial matter, we acknowledge that here, unlike in the *Ballet Makers* situation, the holder of the Name, Jump, has apparently not technically authorized Zadikoff (or anyone else) to use the Name in connection with the Loomis restaurant. The holder of the mark in *Ballet Makers* had licensed the mark both to the plaintiffs and a subsequent licensee, which was an important factor in the court's determination that there could be no consumer confusion since all products bearing the mark were "genuine." *Id.* at 1335. However, here plaintiffs allege that the Loomis restaurant will take advantage of the Name in a manner that we think is

tantamount to authorized use. Specifically, since Jordan (through Jump) will be part owner of a restaurant that will allegedly engage in the *de facto* use of the Name to market the business (am.cplt.¶¶ 36–43), he effectively stands in the same position as the licensor in *Ballet Makers,* even though there are no written contracts concerning the use of the Name at the Loomis restaurant.

■ Given this fact, we think that there can be no likelihood of confusion since there is no doubt that the services offered by the Loomis restaurant will correctly designate that Jordan is the source of the product. Accepting the plaintiffs' allegations as true, it will be clear to the public that Jordan sponsors or otherwise approves of the use of his Name in connection with the Loomis restaurant, despite the fact that plaintiffs have been licensed to use the Name. This fact is fatal to plaintiffs' Lanham Act claim. As different courts have noted, a claim under § 1125(a) does not lie where there is no confusion about the ultimate source of the goods (interpreted to mean the owner of the mark), even though an exclusive licensee of the mark has a legitimate claim that its licensing agreement has been violated. *See Genin, Trudeau & Co. v. Integra Dev. Intern.,* 845 F.Supp. 611, 615–16 (N.D.Ill.1994) (holding that licensee had no claim of trademark infringement where the owner of the mark had subsequently authorized a different company to manufacture identical goods); *L.G.B. Inc.,* 769 F.Supp. at 1250 (dismissing plaintiff licensee's claim for trademark infringement where owner of mark sold product in violation of plaintiff's exclusive licensing agreements); *Ballet Makers,* 633 F.Supp. at 1335. This makes sense since the Lanham Act is designed to protect the public, not licensees. *Ballet Makers,* 633 F.Supp. at 1334. Thus, there is no § 1125(a) violation here since there is no confusion that Jordan's company, Jump, owns the rights to the Name and has allegedly authorized the use of the name in connection with the Loomis restaurant, although it had previously licensed the Name to plaintiffs for the purposes of providing goods and services at Michael Jordan's Restaurant. The plaintiffs' reference to *Burma–Bibas, Inc. v. Excelled Leather Coat Corp.,* 584 F.Supp. 1214 (S.D.N.Y.1984), is

not to the contrary. In that case Burma–Bibas, a licensee of Oleg Cassini products, filed suit under § 1125(a) after Cassini had subsequently licensed another company to manufacture the same products. Judge Lasky (writing two years before the decision in *Ballet Makers*) found that Burma–Bibas' § 1125(a) claim survived the defendants' motion to dismiss. *Id.* at 1217. However, the court specifically premised its decision on the fact that Burma–Bibas had alleged that it was "the practice in the menswear trade for quality products under a designer name to be manufactured by a single source manufacturer pursuant to an exclusive licensing agreement," *Id.* at 1216. Also, the plaintiff's complaint set forth specific instances of confusion on the wholesale customer level which purportedly was created by the subsequent licensee's showing the Cassini products line. *Id.* It was, therefore, in this limited situation that the court held that Burma–Bibas had stated a claim under § 1125(a). *Id.* at 1217.

Thus, plaintiffs' argument that *Burma–Bibas* stands for the broad proposition that a licensee may be the "source" of the goods for the purposes of determining the likelihood of confusion is misplaced. Rather, the *Burma–Bibas* holding is restricted to the case where there is evidence that the consuming public would be confused because of the trade practice of single-source manufacturing. There is nothing to indicate that that is the practice here. Rather, as plaintiffs state, in this case public confusion would arise as to "whether Plaintiffs or Zadikoff is exclusively authorized to use the NAME in connection with a restaurant business in the Chicago Metropolitan Area" (pls. opp. mem. at 6). However, as *Ballet Makers* makes clear, this confusion is irrelevant for the purposes of § 1125(a). The relevant inquiry is simply whether the public is confused as to whether the mark's owner has approved the use of the mark. 633 F.Supp. at 1334. Since it is clear that Jordan has approved the use of the Name in connection with Michael Jordan's Restaurant and, allegedly, the Loomis restaurant, there is no such likelihood of confusion.

We also reject plaintiffs' argument that its "control" over the quality of the product at Michael Jordan's Restaurant makes it the appropriate "source" of the product for the purposes of analysis under § 1125(a). It is true that the *Ballet Makers* court, in concluding that no confusion existed, emphasized that the owner of the mark, U.S. Shoe, retained ultimate control over the quality of the manufactured goods *produced by the defendant licensee.* 633 F.Supp. at 1335. The issue was whether the goods bearing the Capezio mark produced by the defendant licensee were "genuine" products "authorized" by U.S. Shoe. *Id.* The issue of whether U.S. Shoe retained quality control over the plaintiff was not addressed. Thus, in this case it makes no difference whether Jump retained the ultimate control over the quality of the goods and services provided by Michael Jordan's Restaurant. Moreover, even if Jump's control over Michael Jordan's Restaurant were relevant, we think that the contract reserves to Jump the requisite degree of control to establish Jordan as the "source" of the goods (am.cplt.exh. A, ¶ 6).

Under the circumstances described, we find that there is no confusion that the planned use of the Name in connection with the Loomis restaurant accurately designates the correct source of the restaurant's goods and services and does not create a likelihood of confusion within the meaning of § 1125(a). Accordingly, Count I is dismissed.

■ Plaintiffs do not dispute that Count II, based on the common law of unfair competition, and Count IV, based on the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq.*, and the Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*, must rise or fall based on the Lanham Act claim. This is because the legal inquiry is the same under the Lanham Act as under the Consumer Fraud Act and the Deceptive Trade Practices Act. *See Pesina v. Midway Mfg. Co.*, 948 F.Supp. 40, 43 (N.D.Ill.1996). Furthermore, the common law unfair competition claim need not be separately addressed since it is codified by the Deceptive Trade Practices Act. *See Mars, Inc. v. Curtiss Candy Co.*, 8 Ill.App.3d 338, 290 N.E.2d 701, 704 (1972). Accordingly, because Count I fails, we must also dismiss Counts II and IV.

In Count III, plaintiffs claim Zadikoff's use of the Name in connection with the Loomis restaurant constitutes a common law misap-

propriation of plaintiffs' exclusive use of the Name. Zadikoff first argues that plaintiffs cannot state a cause of action for misappropriation since no Illinois court has held that a licensee has standing to bring such a claim. He cites the Illinois Appellate Court in *Dwyer v. American Express Co.*, 273 Ill. App.3d 742, 210 Ill.Dec. 375, 652 N.E.2d 1351, 1355 (1995), for the proposition that the tort of common law misappropriation in Illinois is a branch of the tort of invasion of privacy and hence can only be asserted by the person whose privacy is invaded. Since Jordan is not asserting that his privacy right has been invaded, Zadikoff concludes that plaintiffs cannot state a misappropriation claim.

However, Zadikoff's argument that the common law tort of misappropriation is based exclusively on privacy rights misses the mark. It is true that Illinois has adopted a version of the tort of misappropriation that is a "branch of the privacy doctrine," and requires that a plaintiff show "an appropriation, without consent, of one's name or likeness for another's use or benefit." *Dwyer*, 652 N.E.2d at 1355. However, the fact that no Illinois court has addressed the relationship between the tort of misappropriation and the "right to publicity," does not mean that the Illinois courts have rejected the weight of authority recognizing a cause of action for "right to publicity" misappropriation of a name, likeness, or personality. *See Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 730 (8th Cir.1995), *cert. denied*, 516 U.S. 1174, 116 S.Ct. 1268, 134 L.Ed.2d 215 (1996); *Winterland Concessions Co. v. Sileo*, 528 F.Supp. 1201, 1213–14 (N.D.Ill.1981), *Uhlaender v. Henricksen*, 316 F.Supp. 1277, 1281 (D.Minn.1970); *Hirsch v. S.C. Johnson & Son, Inc.*, 90 Wis.2d 379, 280 N.W.2d 129 (1979); *see also* David A. Elder, *The Law of Privacy* § 6.1 (1991).[3] These authorities distinguish the tort of misappropriation from the general tort of invasion of privacy, on the ground that the former protects pecuniary and proprietary interests while the latter

protects emotional interests. *See Uhlaender*, 316 F.Supp. at 1280.

■ Once this distinction is understood, Zadikoff's argument that only Jordan could assert a claim of misappropriation must fail. Since the tort of misappropriation is premised on a person's economic interest in publicity rights, the range of plaintiffs who have standing to make a misappropriation claim expands to the extent that such publicity rights are assignable. Thus, courts have stated that the exclusive licensee of the right to exploit a celebrity's name, likeness or personality has a propriety interest (a right to publicity) assignable in gross to the extent permitted under the original licensing agreement. *Id.* at 1281; *see also, Haelan Laboratories, Inc. v. Topps Chewing Gum*, 202 F.2d 866 (2d Cir.1953), *cert. denied*, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953). We agree and find that in a case such as this Illinois courts would side with the weight of authority and hold that a licensee of a celebrity's name may state a cause of action for misappropriation of the right to publicity.

■ Zadikoff also argues that Count III must fail because plaintiffs have not adequately alleged the tort of misappropriation. His only argument is that plaintiffs have failed to allege that Zadikoff appropriated Jordan's name or likeness without *Jordan's* consent. Clearly, this argument is without merit. As we have found that plaintiffs may bring a claim of misappropriation under a right to publicity theory, the relevant inquiry becomes whether Zadikoff appropriated the Name without *plaintiffs'* consent, since it is plaintiffs who are exclusively licensed to use the mark in connection with restaurants in the Chicago area. Plaintiffs allege that Zadikoff started a whispering campaign regarding the opening of the Loomis restaurant, released information to the media regarding Jordan's affiliation with the restaurant, and intends to take advantage of Jordan's Name by locating the restaurant near the United

---

**3.** One commentator has noted that much of the confusion between the right of privacy and publicity has resulted from the fact that many litigants choose to sue for invasion of privacy rather than for the appropriation of property rights in situations where injury to feelings has only sec-

ondary application. Gordon, *Right of Property in Name, Likeness, Personality and History*, 55 Nw. U.L.Rev. 553, 554 (1960). This is, in fact, what happened in *Dwyer*, where the plaintiffs chose to sue under an invasion of privacy theory. .

Center, serving "Carolina Style Food," and having Jordan personally appear to promote and endorse the restaurant. We think that these allegations are sufficient to state a cause of action for misappropriation against Zadikoff. Therefore, Zadikoff's motion to dismiss Count III is denied.

Count V alleges a claim for breach of fiduciary duty. Specifically, plaintiffs allege that as "Chief Executive of Michael Jordan's Restaurant, with access to and knowledge of confidential and proprietary information" (am.cplt.¶ 62), Zadikoff owed plaintiffs fiduciary duties which he breached by (1) appropriating plaintiffs' trade secrets for use in connection with the Loomis restaurant, (2) soliciting plaintiffs' private partners to invest in the Loomis restaurant, (3) soliciting employees of Michael Jordan's Restaurant to work at the Loomis restaurant, and (4) by using Michael Jordan's Restaurant to meet with plaintiffs' partners and employees to discuss the Loomis restaurant venture.

■■■ In Illinois, certain relationships are considered fiduciary relationships as a matter of law. See Peterson v. H & R Block Tax Servs., Inc., 971 F.Supp. 1204, 1212 (N.D.Ill.1997). One such relationship is that of principal and agent. Id. at 1213 ("Once an agency relationship is found, a fiduciary relationship arises as a matter of law."). To determine whether an agency relationship exists the court must consider two factors: (1) whether the principal has the right to control the manner and method in which agent performs his services, and (2) whether the agent has the power to subject the principal to personal liability. Knapp v. Hill, 276 Ill. App.3d 376, 212 Ill.Dec. 723, 657 N.E.2d 1068, 1071 (1995); Peterson, 971 F.Supp. at 1213. While the existence and extent of the agency relationship is a question of fact, the plaintiff must sufficiently allege that an agency relationship existed in order for his complaint to survive a Rule 12(b)(6) motion to dismiss. See Cumis Ins. Society Inc. v. Peters, 983 F.Supp. 787, 796 (N.D.Ill.1997). While acting as a fiduciary, one owes a duty of fidelity and loyalty to the principal and cannot act inconsistently with his or her agency. See ABC Trans. Nat. Transport, Inc. v. Aeronautics Forwarders, Inc., 62 Ill. App.3d 671, 20 Ill.Dec. 160, 379 N.E.2d 1228, 1237 (1978).

Zadikoff argues that plaintiffs cannot state a claim for breach of fiduciary duty because they cannot establish that he is plaintiffs' agent. Specifically, he argues that he is an independent contractor to an unrelated limited partnership responsible for running plaintiffs' restaurant and, as such, cannot be held to have any fiduciary relationship with plaintiffs. Zadikoff strenuously objects to plaintiffs' characterization of him as the "Chief Executive" of Michael Jordan's Restaurant and argues instead that the contracts governing his relationship with plaintiffs clearly demonstrate that he is an independent contractor.

■■■ Before we address the substance of this argument, we must determine whether, as Zadikoff suggests, we may consider the contracts that define the scope of his relationship with plaintiffs, since plaintiffs have not included these documents as exhibits to their complaint. Zadikoff contends that he is entitled to attach the contracts to his motion to dismiss without converting it into a summary judgment motion, as required under Rule 12(b)(6) when "matters outside the pleadings are presented," since plaintiffs refer to the contracts in their complaint and they are central to evaluating plaintiffs' claim. See Venture Assoc. v. Zenith Data Systems, 987 F.2d 429, 431 (7th Cir.1993). We agree that plaintiffs' complaint does refer to Zadikoff's "contractual commitments" and includes a lengthy discussion of Zadikoff's duties as "Chief Executive" that appear to be very similar to the "Manager's" fights delineated in the Restaurant Management Agreement (Zadikoff's mo., exh. A, § 3.1, p. 28). Furthermore, given that claims for breach of fiduciary duty are controlled by the substantive laws of agency, contract, and equity, Kinzer v. Chicago, 128 Ill.2d 437, 132 Ill.Dec. 410, 539 N.E.2d 1216, 1220 (1989), we think that the contracts defining Zadikoff's relationship with plaintiffs are clearly central to plaintiffs' claims. On this basis we will consider the management contracts in evaluating Zadikoff's motion to dismiss.

These contracts indicate that plaintiffs entered into a Restaurant Management Agreement with RMI Limited Partnership (RMI), which is affiliated with Hyatt Corporation

(Hyatt). This agreement appoints RMI as "the sole and exclusive management agent of Owner for the Restaurant" and grants to RMI the "sole and exclusive fight to manage and operate the Restaurant pursuant to the terms of this Agreement" (Zadikoff mo., exh. A, § 3.1). The agreement further provided that RMI may not operate or manage any other restaurant "incorporating a sports or sports celebrity theme" within a one-mile radius of plaintiffs' restaurant (*id.,* § 22). Hyatt, on behalf of RMI, entered into a Consulting and Administrative Services Agreement with Cornerstone Management & Consulting, Inc. (Cornerstone), which states that Cornerstone is an "independent consultant" that is to provide "consulting, administrative and other services" to RMI (among other "Hyatt Entities") (Zadikoff mo., exh., ¶¶ 6, 17(b)). Zadikoff is a principal of Cornerstone.

On the basis of these contracts Zadikoff asserts that he is simply an independent contractor for RMI and has no direct contractual relationship with plaintiffs—certainly not one pursuant to which he acts as "Chief Executive" of Michael Jordan's Restaurant. However, the existence of an agency relationship is determined based on the actual practices of the parties, and not merely by reference to a written agreement. *Wargel v. First National Bank of Harrisburg,* 121 Ill.App.3d 730, 77 Ill.Dec. 275, 460 N.E.2d 331, 334 (1984). Plaintiffs allege that Zadikoff had significant responsibilities in managing Michael Jordan's Restaurant, including determining hours of operation, selecting vendors and suppliers, determining the menu, setting prices, establishing labor policies and the restaurant's budget, and signing corporate checks. We cannot say that these allegations are insufficient as a matter of law to establish the existence of an agency relationship. Whether or not Zadikoff actually carried out these duties, the degree of control plaintiffs' exerted over his actions, and the extent to which these actions could be imputed to plaintiffs for the purposes of determining liability, are factual issues that should not be resolved on a motion to dismiss. *See Id.* at 334.

Zadikoff's argument that the contracts contradict plaintiffs' complaint and clearly establish that plaintiffs did not exert the requisite degree of control is unavailing. That the contracts defined the scope of Cornerstone's authority as limited to "consulting, administrative and other services" does not demonstrate the authority plaintiffs actually reposed in Zadikoff or how much plaintiffs supervised Zadikoff on a day-to-day basis. We thus find that the contracts, while shedding light on the relationship between Zadikoff and plaintiffs, do not contradict the allegations contained in plaintiffs' complaint, which we are obligated to accept as true for the purposes of this motion.

We also refuse to dismiss Count V based on Zadikoff's argument that he was merely a "subagent" whose duties to plaintiffs were limited by the terms of the Restaurant Management Agreement with RMI. It is true, as Zadikoff notes, that a subagent "stands in a fiduciary relation to the principal, and is subject to all the liabilities of an agent to the principal...." Restatement (Second) of Agency § 5(1) cmt. d. On this basis Zadikoff argues that his duty to plaintiffs could have been no greater than RMI's duty to plaintiffs. Thus, Zadikoff claims that he was only limited by RMI's promise not to open a sports-theme restaurant within one mile of Michael Jordan's Restaurant. Because the Loomis restaurant is outside this one-mile radius, he claims that he has not violated any rights he owed to plaintiffs as a subagent. However, we do not think that, on the basis of the factual allegations detailing Zadikoff's myriad responsibilities, we can say that plaintiffs could prove no set of facts that would support their claim that Zadikoff was plaintiffs' agent, despite the parties' contractual arrangement. *See Conley,* 355 U.S. at 45–46, 78 S.Ct. 99. Again, it is conceivable that Zadikoff's actual relationship with plaintiffs took the form of an agency relationship, even though the contractual language would indicate otherwise. Accordingly, we deny Zadikoff's motion to dismiss Count V.

Finally, Count VI alleges a claim for violation of the Illinois Trade Secrets Act, 765 ILCS 1065/2(d) (ITSA). The ITSA provides that

"Trade secret" means information, including but not limited to, ... financial data, or

list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure and use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). In order to prove improper use of a trade secret a plaintiff must establish that information was (1) secret (that is, not generally known in the industry), (2) misappropriated, and (3) used in the defendant's business. *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263 (7th Cir.1992). In paragraph 28 of plaintiffs' amended complaint, they allege that Zadikoff has received trade secrets in the form of information regarding suppliers, sales, employee history, gross profits, revenues, expenses, financing agreements, investor lists, marketing plans, and special customer relationships.

Zadikoff objects, that these alleged "trade secrets" are in reality the sort of generalized business information that courts have found is not protectable under the ITSA. *See AMP, Inc. v. Fleischhacker*, 823 F.2d 1199, 1203–04 (7th Cir.1987); *Applied Indus. Materials Corp. v. Brantjes*, 891 F.Supp. 432, 437–38 (N.D.Ill.1994). While it is true that courts have found that certain pricing information is not protectable under the ITSA, *see Applied Indus. Materials Corp.*, 891 F.Supp. at 437–39; *Carbonic Fire Extinguishers, Inc. v. Heath*, 190 Ill.App.3d 948, 138 Ill.Dec. 508, 547 N.E.2d 675 (1989), the touchstone of the inquiry regarding the existence of trade secrets focuses fundamentally on the secrecy of such information. *See Mangren Research & Dev. Corp. v. National Chem. Co., Inc.*, 87 F.3d 937, 942 (7th Cir.1996); *Computer Care v. Service Sys. Enter., Inc.*, 982 F.2d 1063, 1072 (7th Cir.1992). Thus, the type of information that plaintiffs allege may be considered trade secrets, where it is "sufficiently secret as to derive economic value...." 765 ILCS 1065/2; *see, e.g., Brostron v. Warmann*, 190 Ill.App.3d 87, 137 Ill.Dec. 379, 546 N.E.2d 3, 5 (1989) (finding that gross profits may be protectable trade secrets); *Carbonic Fire Extinguishers, Inc.*, 138 Ill.Dec. 508,

547 N.E.2d at 677 (stating that "pricing information" may be a trade secret under the ITSA, although finding that plaintiffs had failed to make the required showing in that case).

■ Because the information plaintiffs allege falls within the general category of what potentially could constitute a trade secret under the definition set forth in the ITSA, 765 ILCS 1065/2(d) (defining "trade secret" as, *inter alia*, "financial data, or list of actual or potential customers or suppliers" that is "sufficiently secret to derive economic value" and is "subject to efforts that are reasonable ... to maintain its secrecy...."), the allegations state a claim under the ITSA. Although plaintiffs may not have specifically alleged that they exercised reasonable efforts to maintain the confidentiality of the alleged trade secrets, the federal rules require only notice pleading and this omission may be easily corrected by amendment. Therefore, we deny Zadikoff's motion to dismiss Count VI.

We note, in closing, that until now the basis of our subject matter jurisdiction has been plaintiffs' Lanham Act claim since there is no diversity of citizenship. We have been reviewing plaintiff's pendent state law claims from the perspective of the federal pleading requirements. However, we question whether we continue to have subject matter jurisdiction since we have dismissed plaintiffs' Lanham Act claim. Although we do not decide that issue here, we note that a dismissal of plaintiffs' case without prejudice might require them to revisit their state law claims in state court under the state's separate pleading standards.

### CONCLUSION

For the foregoing reasons, Zadikoff's motion to dismiss Counts I, II, and IV is granted. The motion to dismiss Counts III, V, and VI is denied.